## SAND SPRINGS RAILWAY CO. v. McWILLIAMS.

No. 20394.    April 10, 1934.

Rehearing Denied Nov. 13, 1934.

Application for Leave to File Second Petition for Rehearing Denied Dec. 18, 1934.

C. B. Stuart, Chas. A. Coakley, E. J. Doerner, and P. P. Pinkerton, for plaintiff in error.

Breckinridge & Bostick and Moss & Young, for defendant in error.

OSBORN, J.   This action was commenced in the district court of Tulsa county by W. B. McWilliams against the Sand Springs Railway Company as an action for damages for personal injuries.   It is a companion case to the case of Shields v. Sand Springs Railway Co., 150 Okla. 177, 1 P. (2d) 144. The cause was tried to a jury, which resulted in a verdict for plaintiff in the sum of $20,000.   From a judgment thereon, defendant has appealed.   The parties will be referred to as they appeared in the trial court.

It appears that the defendant company owned and operated a railway between Tulsa and Sand Springs, and used both steam and

electric trains; that it maintained a double track, the trains going west customarily using the north track, and going east, using the south track; that near a station known as Hale the railway intersected a paved highway, which was the principal highway between Tulsa and Sand Springs, and over which there was considerable travel.

On the night of March 22, 1924, about 9:00 o'clock p. m., plaintiff, in company with three other persons, was traveling in a Ford touring car on said highway and approached the crossing from the south. At that time a rain was falling and the sky was overcast with clouds. When the Ford car reached the south track of the defendant company, it was struck by an electric switch engine, traveling west on the south track. The car was overturned and plaintiff suffered numerous and severe injuries. Since no assignment of error is presented in the brief on the question of excessive damages, there will be no necessity to set out in detail the nature of the injuries.

At the time of the injury, the Ford car was being operated by one Frank McLean, the owner of the car, a friend of plaintiff. A lady, Mrs. Shields, was occupying the front seat of the car with McLean. The plaintiff and one Mrs. Cheshire were occupying the back seat of the car.

Plaintiff alleges that defendant had placed at the crossing an electric alarm bell that was designed to ring an alarm when cars on either of defendant's tracks were approaching the highway crossing; that, at the time of the collision, one of defendant's passenger cars was standing lighted about 50 yards east of the highway crossing; that for a long time prior to the date of injury, it had been the custom of defendant to use the north track for its cars going from Tulsa to Sand Springs and to use the south track for cars going from Sand Springs to Tulsa, which custom was well known to Frank McLean, the driver of the car, and to plaintiff; that at the time of the injury, the switch engine, which struck the car in which plaintiff was riding, was going to Sand Springs from Tulsa on the south track. It is alleged that the electric alarm bell failed to work and was not ringing at the time plaintiff and his companions approached the crossing. It is further alleged that as the switch engine approached the crossing, the employees of defendant company, in charge thereof, failed to sound a whistle or gong or to give any notice of approach of said engine to said crossing. It is further alleged that defendant failed to use or have a flagman to warn travelers upon the highway of approaching cars or trains on the track.

Defendant denies negligence on its part and alleges that plaintiff was guilty of contributory negligence, which was the proximate cause of the injury, and that plaintiff therefore cannot recover.

Defendant contends that while under the Constitution contributory negligence is a question of fact for the jury, under the record in this case, there is not sufficient evidence as to primary negligence on the part of the defendant to authorize a verdict against defendant. In this connection, the testimony is highly conflicting. There is evidence on the part of the plaintiff that the alarm bell did not work and that no warning was sounded from the switch engine as it approached the crossing on the south track, not customarily used for westbound traffic, while there is positive evidence on behalf of defendant that the electric alarm was working and that ample warning was given by ringing the bell and blowing the whistle as the engine approached the crossing. The rule is well settled in this jurisdiction that in an action at law where the evidence is conflicting, this court will not review the evidence to ascertain where the weight of the evidence lies. If there is any evidence reasonably tending to support the verdict, it will not be set aside. St. Louis & S. F. Ry. Co. v. Russell, 130 Okla. 237, 266 P. 763; St. Louis & S. F. Ry. Co. v. Rundell, 108 Okla. 132, 235 P. 491; Dague v. McCaslin, 81 Okla. 66, 196 P. 696.

Defendant argues that the evidence offered by plaintiff on this point is negative in character and insufficient to overcome the positive testimony of defendant that the proper signals were given. In this connection, certain witnesses, who were approaching the crossing in another car just about the time of the collision, were introduced by plaintiff. These witnesses testified they did not hear the whistle, gong, or bell. Testimony of this character is not negative testimony, where it is shown that the witnesses were in a position to hear and could have heard the signals had they been given. In the case of St. Louis & S. F. Ry. Co. v. Russell, supra, it is said:

"A number of witnesses for defendant testified that the proper signals were given immediately after the train had passed over the Santa Fe crossing. Counsel for defendant say that plaintiff's evidence is negative in character, and is not sufficient to overcome the positive testimony that the signals were given. With this we do not agree.

Some of the evidence above referred to is positive in form as well as character. Other evidence negativing the giving of the signals is negative in form, but not purely of a negative character. It has been repeatedly held by this court, and many others, that evidence that one did not hear a signal given, when he was in a position to hear and could have heard had it been given, is not purely negative in character, but is a positive statement of a fact. The value of such testimony depends upon whether the witness was in a position to hear, and the amount of attention he gave the giving of signals. Zenner v. Great Northern Railroad Co. (Minn.) 159 N. W. 1087; St. Louis & S. F. Ry. Co. v. Rundell, 108 Okla. 132, 235 P. 491; Wichita Falls & N. W. R. Co. v. Groves, 81 Okla. 34, 196 P. 677; St. Louis-San Francisco Ry. Co. v. Robinson, 99 Okla. 2, 225 P. 986."

Defendant assigns as error the refusal of the trial court to allow the admission of certain testimony to the effect that, immediately prior to the collision, the plaintiff, or other persons in the car, were engaged in singing a certain song of a vulgar nature. Said testimony was offered for the purpose of showing the nature and character of the enterprise in which plaintiff was engaged at the time, and was objected to for the reason that it would prejudice the jury against the plaintiff. We can find no prejudicial error in the court's ruling. The admission of said testimony would probably have tended to prejudice the jury against plaintiff. We have also examined the record and find that the nature and character of the enterprise in which the parties were engaged at the time of the injury was not seriously disputed by plaintiff or his companions, evidence of which the court freely admitted. The record discloses that all of the occupants of the car were drinking.

Defendant contends that the court erred in refusing certain instructions offered on the theory of imputed negligence. The instructions given by the court, in this contention, are as follows:

"12. However, you are instructed that the negligence, if any, of the driver, McLain, is not imputable to the plaintiff, but the plaintiff was bound, himself, to exercise ordinary care for his own safety, that is, to exercise such care as a prudent person situated under the same or similar circumstances as he was situated would have exercised, both as to his own conduct and as to any influence and control he had or in the exercise of ordinary care could or should have had over the conduct of said driver, McLain, together with all other facts and circumstances in the case.

"13. You are further instructed that if you believe, from a preponderance of the evidence that McLain, the driver of the car in which plaintiff was riding, was guilty of negligence at the time of the accident, and you further believe from a preponderance of the evidence, that the servants of the defendant in charge of the engine of the defendant were also guilty of negligence at the time of the accident, and that such negligence on the part of McLain, if any, and such negligence on the part of the servants of the defendant, if any, concurred to directly and proximately cause plaintiff's injuries, if any there were, then your verdict should be for the plaintiff unless you should further find that the plaintiff was guilty of contributory negligence as that term has been hereinbefore defined in instruction numbers 10 and 12 and other instructions herein."

The instruction offered by the defendant and refused by the court is as follows:

"That where a person enters into an automobile being driven or about to be driven by a person under the influence of intoxicating liquors, and whom he knows to be under the influence of intoxicating liquors, or in the exercise of ordinary care should have known to be under the influence of intoxicating liquors, that it became the duty of such person about to ride in such car, and while riding in said car, to direct the movements of said car, and the actions of the driver of said car; and that if he fails to do so, the law implies that it is his duty to do so; and that any negligence of the driver of said car under such circumstances thereby becomes the negligence of the other occupants—of the passenger or occupant of the car."

Under the decisions of this court there was no error in connection with the giving of said instructions or the refusal of the requested instructions. In the case of Hasty v. Pittsburg County Ry. Co., 112 Okla. 144, 240 P. 1056, it is said:

"In order to impute the negligence of the chauffeur to the one riding, the relation of master and servant or principal and agent must exist, or the parties must be engaged in a joint enterprise, whereby responsibility for the acts of each other exists. St. Louis & S. F. Ry. Co. v. Bell, 58 Okla. 84, 159 P. 336, L. R. A. 1917A, 543; Okla. Ry. Co. v. Thomas, 63 Okla. 219, 164 P. 120, L. R. A. 1917E, 405; Thrasher v. St. Louis & S. F. Ry. Co., 86 Okla. 88, 206 P. 212; Muskogee Elec. Trac. Co. v. Richards, 97 Okla. 61, 222 P. 265, 267. This rule excludes such imputation otherwise. In the Bell Case, supra, it is said:

"'The doctrine of imputable negligence, except when countenanced by statute, is a fiction of the law, which finds small favor with the courts and has been very infrequently applied in our own.' * * *

"'Assuming that the trip was a "joy ride," as contended, it was not a joint or common undertaking. In Atwood v. Utah Light & Ry. Co., 44 Utah, 366, 140 P. 137, the court, quoting approvingly from Cotton v. Willmar & S. F. Ry. Co., 99 Minn. 366, 109 N. W. 835, L. R. A. (N. S.) 643, 116 Am. St. Rep. 422, 9 Ann. Cas. 935, said:

"'"Parties cannot be said to be engaged in a joint enterprise, within the meaning of the law of negligence, unless there be a community of interests in the objects or purposes of the undertaking, and an equal right to direct and govern the movements and conduct of each other with respect thereto. Each must have some voice and right to be heard in its control and management."'

"We think the right to direct and govern the conduct of each other, referred to above, involves the correlative duty so to do, or responsibility therefor. That duty involves authority in the matter of directing the driving. The principal or master has the right and authority to direct his agent or servant in the matter of driving, whence arises the correlative duty of so doing in a proper case—leastwise a responsibility therefor. Mr. Justice Hardy, in Oklahoma Ry. Co. v. Thomas, 63 Okla. 219, 164 P. 120, says:

"'Disregarding the passenger's own due care, the test whether the negligence of the driver is to be imputed to the one riding depends upon the latter's control or right of control of the actions of the driver so as to constitute, in fact, the relation of principal and agent, or master and servant, or his voluntary unrestrained, noncontractual surrender of all care for himself to the caution of the driver.'

"In this latter alternative, the passenger would become, in law, as mere freight. We do not here attempt to define joint enterprise. It is sufficient to observe some qualities of a joint enterprise that are not present in this case. As held in Schutz v. Wells (Mo. App.) 264 S. W. 479, imputability of automobile driver's negligence to passenger is not determined by the character of the driver's negligence, but by the relationship of driver to passenger. This relationship must be more than, or different from, affinity, as shown hereinafter, or consanguinity. It has no reference to a friend, guest, companion, or invitee. See Bell Case."

The rule contended for by the defendant finds support in some jurisdictions, but this court has heretofore rejected the doctrine of imputed negligence in this jurisdiction, except under certain circumstances not shown in this case. LaFayette v. Bass, 122 Okla. 182, 252 P. 1101; A., T. & S. F. Ry. Co. v. Calhoun, 18 Okla. 75, 89 P. 207, 11 Ann. Cas. 681; Chickasha Street Ry. Co. v. Marshall, 43 Okla. 192, 141 P. 1172; Lone Star Gas Co. v. Parsons, 159 Okla. 52, 14 P. (2d) 369.

In the very recent case of William Miller, Adm'r, v. Union Pacific Railroad Co. (decided Dec. 4, 1933) 290 U. S. 227, 54 S. Ct. 172, 78 L. Ed. 285, the Supreme Court of the United States said:

"Although it was at one time rule in England * * * that the negligence of the driver of a vehicle is imputed to a passenger, that doctrine, much criticised and finally abandoned in England * * * was never generally accepted in this country. Followed by a few state decisions, it was rejected by the great weight of American authority, and, after full consideration, distinctly repudiated by this court. Little v. Hackett, 116 U. S. 366. And see Union Pac. Ry. v. Lapsley, 51 Fed. 174. Whether a passenger or guest in a public or private conveyance, having no control over its movement, may be denied a right of recovery for personal injury or death on the ground of contributory negligence, depends upon his own failure to exercise a proper degree of care, and not upon that of the driver. This is true where the passenger is the wife of the driver as in other cases. Chicago, R. I. & P. Ry. Co. v. Fanning, 42 Fed. (2d) 799, 803. And while the state decisions are not uniform on the subject, the federal rule is definitely settled that the burden of proving such contributory negligence rests, in all cases, upon the defendant * * * although if such negligence be established by plaintiff's evidence, it hardly seems necessary to add, defendant may have the benefit of it."

Defendant argues that McLean was drunk at the time he drove the car upon the tracks, and much evidence was admitted by the court along this general line. The controlling issues of primary negligence on the part of the defendant and contributory negligence on the part of the plaintiff, under proper definitions of each, were submitted to the jury, and the determination of the jury on said issues, under conflicting evidence, is binding on this court.

Defendant contends that the trial court erred in instructing the jury on the doctrine of the last clear chance, and cites in support thereof: Buss v. C., R. I. & P. Ry. Co., 77 Okla. 80, 186 P. 729; St. Louis & S. F. Ry. Co. v. Clark, 42 Okla. 638, 142 P. 396; A., T. & S. F. Ry. Co. v. Baker, 21 Okla. 51, 95 P. 433; Denver City Tramway Co. v. Cobb, 164 Fed. 41; A., T. & S. F. Ry. Co. v. Taylor, 196 Fed. 878; A., T. S. F. Ry. Co. v. Bratcher, 99 Okla. 74, 225 P. 941; Shuck v. Davis, 110 Okla. 196, 237 P. 95.

The facts in the instant case, however,

are distinguishable from the state of facts in the cases cited. The switch engine of the defendant had been on a sidetrack for some time and had just started on its trip towards Sand Springs. Its rate of speed, variously estimated by the witnesses, was from five to ten miles per hour at the time of the collision. The speed of the automobile was estimated to be from 12 to 20 miles per hour by the various witnesses. From the testimony of several of defendant's witnesses, we conclude that there was not a great deal of difference between the speed of the engine and the speed of the car immediately prior to the time they reached the point of collision. There is evidence tending to show that the engine might have been stopped sooner than it was in view of the slow rate of speed at which it was traveling. These facts, in addition to the facts already enumerated, were amply sufficient to justify the submission of said instruction to the jury. See C., R. I. & P. Ry. Co. v. Martin, 42 Okla. 353, 141 P. 276; Thrasher v. St. L. & S. F. Ry. Co., 86 Okla. 88, 206 P. 212; C., R. I. & P. Ry. Co. v. Owens, 78 Okla. 114, 189 P. 171; Muskogee Elec. Trac. Co. v. Tanner, 93 Okla. 284, 220 P. 655; Lusk v. Haley, 75 Okla. 206, 181 P. 727; St. L.-S. F. Ry. Co. v. Bryan, 113 Okla. 39, 237 P. 613; Wichita Falls & N. W. Ry. Co. v. Groves, 81 Okla. 34, 196 P. 677; A., T. & S. F. Ry. Co. v. Baker, 21 Okla. 51, 95 P. 433; St. L.-S. F. Ry. Co. v. Miller, 117 Okla. 60, 245 P. 52; C., R. I. & P. Ry. Co. v. Pedigo, 123 Okla. 213, 252 P. 1095; Southwest Mo. Ry. Co. v. Duncan, 139 Okla. 287, 282 P. 327.

Other assignments of error relating to instructions for the most part have been hereinabove disposed of. All of the instructions, when taken together, fairly presented the issues involved in the case.

The judgment of the trial court is affirmed.

ANDREWS, McNEILL, BAYLESS, BUSBY, and WELCH, JJ., concur. RILEY, C. J., CULLISON, V. C. J., and SWINDALL, J., dissent.

CULLISON, V. C. J. (dissenting). Parties will be referred to as they appeared in the court below.

Defendant in error, plaintiff below, instituted suit against the Sand Springs Railway Company to recover damages for personal injuries alleged to have been sustained in a collision between an automobile and an engine of defendant's on defendant railway line at a crossing between Tulsa and Sand Springs.

Plaintiff alleged that he looked and listened to the best of his ability to see whether or not any train was approaching said crossing from either direction and exercised due care as to his safety. Plaintiff further alleged that there was an electric alarm bell at said crossing designed to ring and give an alarm when cars approached said crossing on defendant's tracks, and that a passenger coach of defendant's was on the north track about 50 yards east of the crossing. That defendant negligently ran one of its freight trains in a westerly direction upon the south track and failed to sound any whistle or bell upon approaching the crossing, and that said train was operated in the opposite direction to the customary and usual direction of moving its cars upon said track. Because of such negligence the freight train struck the automobile in which the plaintiff was riding, causing injury to the plaintiff, for which he prays damages in the amount of $100,000.

Defendant answered, denying generally and specifically all material allegations in plaintiff's petition. Second: "That if any injury was sustained by plaintiff it was due to his own negligence and carelessness." Third: "If the defendant was negligent, which it denies, that the negligence and carelessness of plaintiff contributed to that of defendant and without which said injury would not have been sustained." To which answer plaintiff replied by way of general denial.

The case was tried to a jury and resulted in a verdict and judgment for plaintiff.

Defendant assigns many errors. It will only be necessary to discuss a few of the errors complained of. Defendant alleges in its second assignment of error:

"That the verdict and judgment thereon are not sustained by sufficient evidence and are contrary to law."

A clear and concise statement of the facts and circumstances as disclosed by the record is as follows: Plaintiff and Frank McLain, driver, were engaged as oil well driller and tool dresser, working together. Plaintiff and McLain, the driver of the car, ceased work at 12:00 o'clock noon on the day of the accident, and went to Sand Springs, where they stayed for a short time. Later they entered McLain's Ford touring car and started to Tulsa. On the road between Tulsa and Sand Springs they drove

off the paved highway to a bootlegger's place and purchased one pint of whisky. Plaintiff and McLain drank part of the liquor so purchased and drove on into Tulsa. Shortly after reaching Tulsa, plaintiff called over the telephone and made dates with two women by the name of Shields and Cheshire, and plaintiff and McLain drove out to the Shields home.

The record further shows that plaintiff and McLain, and the women, drank the remaining part of the liquor taken to the Shields home by McWilliams, plaintiff herein, and McLain, the driver of the car. While at the Shields home, all engaged in dancing. Thereafter the four entered McLain's car and started in the general direction of Sand Springs. They drove west from Tulsa on the Tulsa-Sand Springs paved highway, crossed the defendant's railroad track near Hale's Station and drove on beyond some considerable distance. Later, they drove back to the same bootlegger's place of business which was earlier visited by plaintiff and McLain, and purchased one and one-half pints of liquor.

Plaintiff and McLain had previously purchased some peach extract, with which they mixed the last purchase of liquor. Each of the four parties in the automobile partook freely of the mixture, liquor and peach extract, and continued to drive on down the pavement on their return to Tulsa. At the point where they approached the crossing on defendant's railroad, the highway makes an "S" curve, coming around and crossing the railroad at almost right angles, then curves back and follows almost parallel with the street car line to Tulsa.

McLain was driving the car and Mrs. Shields was in the front seat with him. Plaintiff and Mrs. Cheshire were riding in the back seat and it was raining. As they approached the railroad crossing one of defendant's street cars was waiting at the station some considerable distance from the crossing. West of said crossing the trolley line was out of commission and necessitated using the south track for both east and west trains, and an electric freight locomotive of defendant's returning to Sand Springs from Tulsa, crossed over from the north track to the south track and proceeded west on the south track across the paved highway.

The record further shows that defendant had established at said highway crossing an electric bell, which automatically rings, and a signal lighting system, as a warning to persons on the highway; both of which operate when defendant's trains approach within 800 feet of the crossing. The automobile in which plaintiff was riding was driven up onto the railroad crossing and was struck by a locomotive freight engine of defendant's, resulting in injury to the plaintiff, which is the basis of this suit.

The record further shows that the four persons composing the party were freely partaking of intoxicating liquors furnished by this plaintiff and driver, and this plaintiff and driver were in an intoxicated condition. After the accident there was found in the wrecked car three bottles, one of the bottles full of intoxicating liquor and the other two with smaller quantities therein.

If the above and foregoing statements have been clearly established by a fair preponderance of the evidence in the case, it is quite apparent the verdict of the jury and judgment of the court are erroneous and the case should be remanded to the lower court for a new trial.

The defendant having challenged the sufficiency of the evidence and the court in the majority opinion having held "* * * there is evidence on the part of the plaintiff that the alarm bell did not work and that no warning was sounded from the switch engine as it approached the crossing on the south track, * * *" we deem it of prime importance to set out the pertinent testimony adduced at the trial. The testimony in part is as follows, to wit:

### Testimony.

Mrs. Hulda Shields, one of the occupants of the car, called as a witness, testifies as follows:

"Q. At the time of this accident, did you know the plaintiff in this case, Mr. McWilliams? A. Yes, sir. Q. How long had you known him? A. Oh, about two or three months, I guess. Q. Where had you met him? A. I met him at a lodge meeting, at a dance—a dance at the lodge hall—the Yeoman Lodge. * * * Q. Did you know a man by the name of McLain before the day of this accident? A. No, sir. Q. Did you meet a man by the name of McLain on that day? A. Yes, sir. * * * Q. Did you meet him with Mr. McWilliams? A. Yes, sir. Q. On that. State to the jury where you first met him? A. Mr. McLain? Q. Yes. A. Well, I met him that evening about eight o'clock—I guess it was about fifteen minutes to eight when they came out to the house; that is the first time I met him. * * * Q. Anyone with him at that time? A. Mr. McWilliams. * * * Q. Did you leave your house on that night at any time? A. Yes, sir; we left in just a few moments after they came, I guess about five minutes after they came to the house. * * *

Q. Now, who got into the car that evening on this trip? A. Mr. McLain and Mr. McWilliams and Mrs. Cheshire and myself. Q. Who was in the front seat? A. Mr. McLain and myself. * * * Q. Well, did you have an accident on that night? A. Yes, we did. * * * Q. Mrs. Shields, who called up and made that date that night, Mr. McWilliams or Mr. McLain? A. Mr. McWilliams. * * *"

Mr. W. B. McWilliams, plaintiff herein, testifies:

"Q. Now, state to the jury whether or not, on the night of this accident you saw any signals? (Objection sustained to this question) * * * Q. Did you have a conversation with Mrs. Gerskowitz at that time? A. Well, I go in there and have conversation with her all the time; just lived there. * * * Q. Yes. Now, she told you at that time, says, 'Mack, you come here, you go home and go to bed, stay with your mother tonight,' didn't she? ' (Objection sustained) * * * Q. About what time in the afternoon were you in the Gerskowitz Tailor Shop? A. I would judge between five and five-thirty. Q. Was Frank McLain with you? A. Well, I don't recall whether Frank was, or not; I think he was; I ain't positive. Q. Were you drinking at that time; that is, had you had a drink before that? A. A drink— * * * A. I remember that part of it, my doings up until I crossed Madison Street. * * * Q. I will ask you if it is not a fact that you were drinking and on that account she told you you had better go home to your mother? A. No. * * * Q. All right, now Mr. McWilliams, about what time did you say you and McLain got together? A. Between six and seven sometime. * * * Q. Now, I will ask you further if you did not testify the first time that you testified in the Shields' case when you were testifying about this accident, if your lawyer did not ask you: 'Mr. McWilliams, had you and Mr. McLain been drinking before you came over here to Tulsa?' and you said, 'Before we came to Tulsa?' He says, 'Yes,' and you answered, 'At Sand Springs, I do remember taking a drink at Sand Springs.' * * * Q. Now, after you and he got together, whatever time it was, you came out on the pavement in a car towards Tulsa, didn't you? A. Went to Tulsa. * * * Q. I am talking about before you crossed Madison, before you got to Tulsa that night. A. Yes. * * * Q. Sometime in that time you stopped at a drug store and called these girls up? A. Yes, stopped at Alhambra store pharmacy, and talked to them. Q. Who did the talking, you or McLain? A. I did. * * * Q. You knew McLain didn't know these women, didn't you? A. I did, yes, sir. Q. You went in and called up; which one of them did you talk to? A. I talked to Mrs. Cheshire. Q. Mrs. Cheshire, and she was a married woman? A. She was. Q. Did you and McLain go in the house?

A. I did; I don't know whether McLain did or not; I did. * * * Q. Did the two girls come out with you right away, or what did you do there in the house, if anything? A. What did we do in the house? Q. Yes. A. The girls just got their coats on. Q. Well, do you remember anything about the Victrola? A. They had a Victrola out there, yes, sir. * * * Q. Well, you had been to dances with her, hadn't you? A. I had,—had danced with her several times. * * *"

Cross-examination of McWilliams:

"Q. You say nothing happened prior to the time you reached Madison street, to affect your memory; you had been drinking for three days prior to that time, hadn't you? A. Three days? Q. Yes. A. I don't know. * * * Q. Well, weren't you intoxicated two or three days before that time? A. No, sir; I don't remember three days, I don't know; but I never was intoxicated. Q. Weren't you drinking two or three days before that? A. I don't know. Q. Well, will you say you weren't? A. I don't say because I don't know. I don't remember three days before that at all. Q. You don't remember three days before that? A. No, sir. Q. You don't remember being arrested for drunkenness before that? A. No, sir; I don't remember. * * *"

Frank McLain, the driver, testifies:

"Q. What time did you and McWilliams quit work on that day? A. At twelve o'clock noon. * * * Q. After you got to Sand Springs, what did you do, you and McWilliams? A. Well, we left then; we put the car in the barn and left, and went up and went to our rooms, and changed clothes and then ate our dinner, and afterwards made arrangements to come over to Tulsa. * * * Q. Where did you go, out there? A. Well, we went out to a fellow by the name of Bush for some liquor. Q. Well, did you get any? A. Yes, we got a pint. Q. What did you do with that liquor? A. Well, after we left there, and started back why we taken a drink out of it, and then we came on over to Tulsa with the rest of it. * * * Q. What did you do, if anything, with reference to this liquor you had while you were there? A. Well, nothing, only Mack gave her a toddy while we was out there out of it. Q. Now, after you left there, what did you do? A. Well, we came back towards town, and stopped at the first drug store, I think it was, we came by, and Mack called up a couple of other girls we thought were—and made a date with those. Q. Did you know those women before that time? A. No, sir, I didn't. Q. Well, where did you go then? A. Well, we went out to— on—we went out on Federal Drive, I believe, to Lewis. Q. Is that where these women lived? A. Yes, sir. Q. Do you remember the names of those women now? A. Yes, one of them was Mildred Shields and the other one was Mrs. Cheshire. Q. When

you got to their home, what did you do? A. Well, we went in and Mack danced once with Mrs. Cheshire, then afterwards why we drank the rest of this whisky there, and danced a couple of times and some more. and then we started back up to town. Q. That was in the car that you and Mack had been driving? A. Yes, sir. * * * Q. After you started back up to town, where did you go? A. Well, we—coming up Federal Drive, we afterwards made arrangements to go out to Lake Station and get some more whisky. * * * Q. Well, did you go to Lake Station? A. Yes, sir. Q. Turn off the pavement at the same place? A. We went back down to Bush's again. Q. What did you do out there? A. Well—Q. Did you do anything before you got there? A. We stopped at Medio and got a pop bottle full of peach extracts so we could weaken this whisky with it which we was going to get off of Bush, and we went out there then and got a pint and a half of whisky. Q. What did you get a pint and a half for? A. Well, we had this half pint put in a pint bottle so we could pour this peach extracts in and weaken it down. Q. Were the women with you then? A. Yes, sir. Q. What did you do then? A. Well, we drove back just before we crossed the street car track and the railroad, stopped and mixed it and taken a drink there? Q. Who drank out of the bottle? A. All four of us. Q. Two men and two women? A. Yes, sir. Q. All right, tell what you did then? A. Well, after we taken our drink, and had a few toasts we came on across to the pavement and started to Tulsa. Q. Now, where had you agreed to go at that time? A. Well, we hadn't just exactly agreed where we would go; we were coming back to Tulsa, thought some of getting rooms. Q. Getting a room? A. Yes, sir. Q. All right, now as you approached this crossing where the accident happened, was there any conversation, or any singing, or any talking about a song going on? A. Yes, we were singing and laughing and cutting up all the way long. Q. Well, was there any song suggested at a time just before the accident? * * * Q. I believe you have already stated you were intending to go to a hotel somewhere in Tulsa? A. We had thought of it, yes, sir. Q. That is, the whole party? A. Yes. Q. Now, just tell the court and jury, at the time that this accident happened, and before it happened, what condition the party was in—Mrs. Shields was sitting in the front seat with you, wasn't she? A. Yes, sir. Q. And Mrs. Cheshire in the back seat with Mr. McWilliams? A. Yes, sir. Q. And you were driving? A. Yes, sir. Q. How many hands were you using in driving? A. One. Q. What were you doing with the other one? A. I had my arm around Mrs. Shields. * * * Q. Well, now, Mr. McLain, when you turned off up there on that dirt road, and went up to Bush's house, from that time until you came back to the pavement, while you were in the car, what was the party doing with reference to

—A. Well, we were joking and singing, and telling toasts. Q. After you got on the pavement, did the same conduct continue? A. Mostly the same. * * * Q. How long did that conduct continue? A. Well, I guess if you mean what time we were together and before the accident, it was about two hours and a half. * * * Q. All right, now as you approached this crossing where the accident happened, just tell what you saw and heard, just all you know about what happened. A. Well, we were coming around a curve there, and it was raining pretty hard, and I looked ahead and saw the lights and bell ringing, and looked for a street car, but I never saw any street car, and I never saw the switch engine until it hit me. I seen a light, but I thought it was a car coming around a curve meeting me; I never recognized it was a switch engine until it had already hit us. And as soon as it hit us why I realized what had happened. Q. What did you say you saw as you came around the curve? A. I saw the signal lights, and the bell. And I saw another light, the light on the switch engine. I saw it, but I misplaced it as a car coming around on the other curve. And as the bells were ringing, I looked for a street car, thought that was what was causing the bells to ring, but I didn't see any."

Cross-examination by Mr. Breckinridge:

"Q. Now, you say that you, as you came up to this crossing, just prior to this accident, you looked ahead? A. Yes, sir. Q. Yes, sir. And you saw—you heard some bells ringing? A. I heard the signal bell, and the lights. Q. All right, you heard the lights. A. I saw the lights, and heard the bell. Q. Oh, yes, sir. Now, where was the signal bells that you heard? A. They were right on the crossing. Q. Those were the stationary signal bell there, were they? A. Well, they were the road crossing signals. * * * Q. You got a pint and a half out there that time? A. Yes, sir. Q. So you took, as I understand you to say, you had two pint bottles, you had one of them filled with liquor, is that right? A. Yes, sir. Q. And you had another one—how much did you have in the other one? A. We had a half a pint of whisky in a pint bottle. Q. In a pint bottle? A. Yes, sir. Q. You had—what else did you have? A. We had a pop bottle with some peach extracts. Q. Peach extracts in it? A. Yes, sir. Q. Now, did you fill up this pint bottle that you had, half full? A. No, sir. Q. How near did you fill it up? A. Well, I could not say, but we were figuring on splitting the pop bottle of extracts into the pint and a half of whisky. Q. Now, you didn't take a drink out there that time until you got back near the railroad track, is that right? A. Yes, sir. Q. All of you took a drink at that time? A. Yes, sir. Q. You took a small drink, didn't you? A. Well, I didn't look to see how big a drink any of them was taking. Q. Didn't you testify on the examination before that you did take a small drink? A. No, sir. Q.

All right. A. I never did in my life. Q. Never took a small drink in your life. All right. * * * 'Q. Then you say you started back. After you got this liquor at Lake Station, where did you mix it—Where did you mix this extract? A. Right there; we taken the drinks just across the tracks from Lake Station. Q. And you took one small drink? A. Yes, sir.'—Did you give that answer? Sir? A. Yes, sir. * * *"

Mrs. Gerskowitz testifies:

"Q. State your name, please? A. Mrs. Gerskowitz. * * * Q. Do you remember the date that Mr. McLain and Mr. McWilliams had this accident at Hale crossing? A. Yes, sir. Q. Did you see Mr. McWilliams that afternoon? A. Yes, sir. Q. About what time in the afternoon did you see him? A. It was pretty late in the afternoon. Q. What was his condition with reference to whether he appeared to be—A. Well, he came into the store, and had his coat; it was torn, and I fixed it for him. He asked me to fix it for him. (Objection) By the Court: I can't hear this witness' testimony. You will have to talk louder, lady. These gentlemen over there all have to hear you; I have to hear you. A. Well, you see, when Mr. McLain, Mack McWilliams—and McWilliams came over to the store to have his coat fixed, it was kind of raining that afternoon, and, of course, it was a heavy coat, and he helped me hold it so I can fix it for him. Well, by way, of course, he was feeling pretty good. Q. Well, what do you mean by feeling pretty good? A. Well, I think that he really had been drinking. Q. What? A. I think he had a little drink. Q. Uh, huh, A. So I told him, I says 'Mack.' I says, 'You better go home.' (Objection, which is later waived). Q. All right, go ahead. A. So, I says, 'Mack, you better go home and stay home, and take care of yourself tonight.' And he says, 'I will do that, Mrs. Gerskowitz,' I says, 'Now Mack,' I says, 'give me your word of honor you are going to stay at home.' He says, 'Yes, ma'am, I sure will.' He promised me. * * *"

It is said in the majority opinion:

"Under the decisions of this court there was no error in connection with the giving of said instructions or the refusal of the requested instructions."

Instruction No. 12 given by the trial court read in part:

"However, you are instructed that the negligence, if any, of the driver McLain is not imputed to the plaintiff. * * *"

The above statement, standing alone, is not a full and correct statement of the law. The rule as laid down by this and other courts in actions involving contributory negligence is: If the relation of master and servant does not exist, and the facts and circumstances show the plaintiff guilty of contributory negligence as defined by the law, then the negligence of the driver may be imputed to the plaintiff and the plaintiff cannot recover.

Doubtless the trial court gave instruction No. 12 in good faith, believing the unquoted part of the instruction sufficiently explanatory. Both plaintiff and defendant excepted to the giving of said instruction, but were overruled by the court.

Defendant offered requested instruction No. 14, which we deem a full and correct statement of the law of contributory negligence applicable in the instant case, which instruction was by the court refused. Defendant's requested instruction No. 14 reads:

"That where a person enters into an automobile being driven or about to be driven by a person under the influence of intoxicating liquors, and whom he knows to be under the influence of intoxicating liquors, or in the exercise of ordinary care should have known to be under the influence of intoxicating liquors, that it became the duty of such person about to ride in such car, and while riding in said car, to direct the movements of said car, and the actions of the driver of said car; and that if he fails to do so, the law implies that it is his duty to do so; and that any negligence of the driver of said car under such circumstances thereby becomes the negligence of the other occupants—of the passenger, or occupant of the car."

Defendant in its second assignment of error said:

"That if any injury was sustained by plaintiff it was due to his own negligence and carelessness."

The court in the majority opinion overlooks the above assignment of error, and cites Hasty v. Pittsburg County Ry. Co., 112 Okla. 144, 240 P. 1056, wherein the general rule of contributory negligence is properly enunciated, but is inaccurately applied to the facts and circumstances in the instant case.

The rule in the Hasty Case is as follows:

"In order to impute the negligence of the chauffeur to the one riding, the relation of master and servant or principal and agent must exist, or the parties must be engaged in a joint enterprise whereby responsibility for the acts of each other exists."

Observe the court in the Hasty Case says:

"The contributory negligence of a chauffeur is imputable to one riding as a guest or companion **only** where the relation of master and servant or principal and agent exists, or where the parties are engaged in

a joint enterprise whereby the responsibility for each other's acts exists."

It therefore follows as a legal conclusion: If the relation of master and servant does not exist, then the converse, or exception, to the general rule is equally true, namely, if the relation of master and servant does not exist, the negligence of the chauffeur may be imputed to the guest where the facts and circumstances clearly show the guest is guilty of contributory negligence.

In Little v. Hackett, 116 U. S. 371, Justice Field holds the exception or converse of the general rule of contributory negligence "is a rule of established law and a principle of common justice." In truth and in fact the learned Justice recognizes and holds the exception (to the general rule) of contributory negligence as the **general** rule, where contributory negligence is pleaded and established.

In Little v. Hackett, the Justice says:

"That one cannot recover damages for an injury to the commission of which he has directly contributed is a rule of established law and a principle of common justice. And it matters not whether that contribution consists in his participation in the direct cause of the injury or in his omission of duties which, if performed, would have prevented it. If his fault, whether of omission or commission, has been the proximate cause of the injury, he is without remedy against one . also in the wrong."

The Justice further says:

"It would seem that the converse of this doctrine should be accepted as sound—that when one has been injured by the wrongful act of another, to which he has in no respect contributed, he should be entitled to compensation in damages from the wrong-doer."

Observe: The learned Justice makes the exception the general rule, where pleadings, facts, and circumstances show the plaintiff guilty of contributory negligence.

There is not a scintilla of evidence in this entire record to show that the relation of master and servant, or principal and agent, ever existed between the plaintiff or the driver of the car and the defendant railway company. And not a word of evidence to show that plaintiff and McLain, the driver, ever engaged in a joint enterprise as that term is defined and understood in law.

We have therefore the converse or exception to the general rule of contributory negligence in the instant case. Keeping in mind the facts and circumstances in the instant case, it logically follows that the general rule of contributory negligence is inapplicable to the case at bar, but the converse or exception to the general rule is applicable and controlling herein.

Defendant alleged in its answer: "That if any injury was sustained by plaintiff it was due to his own negligence and carelessness," thereby pleading contributory negligence as a defense to plaintiff's action.

Defendant pleaded negligence on the part of the plaintiff, and repeatedly requested the court to give certain instructions wherein the facts and circumstances clearly show plaintiff (guest) to be guilty of contributory negligence, but said requested instructions were peremptorily refused by the court to the great prejudice and detriment of the defendant.

### Imputable Contributory Negligence.

"The rule of contributory negligence is based not so much upon considerations of what is just to defendant as upon those of public policy, which require that every one should take reasonable care of his own person and property; and, upon the further principle that when both parties are in fault, the law, as a general rule, will withhold its aid, and leave them to the consequences of their own wrong." St. L. & S. F. Ry. Co. v. Herrin, 26 S. W. 425, 6 Tex. Civ. App. 718 (citing Houston & T. C. Ry. Co. v. Smith, 52 Tex. 184).

### Common-Law Rule.

"According to the rule of common law, there can be no recovery for injuries where it appears that the person injured was guilty of contributory negligence, or, in other words, where the injury was the result of united, mutual, concurring, and contemporaneous negligence of the parties to the transaction. * * *" 20 R. C. L. 99, sec. 87.

This case falls squarely under the exception to the general rule of contributory negligence. The exception to the general rule has been recognized and followed by nearly all courts, both federal and state. The exception or converse of the general rule is especially applicable in an action for damages resulting from a collision of an automobile with a railroad train, where the evidence clearly shows that the relation of master and servant, or principal and agent, does not exist between the driver of the automobile or the guest riding in the car with the driver and defendant railroad company.

"The general statement that contributory negligence is such negligence on the part of plaintiff as helped to produce the injuries complained of includes the idea of both acts and omissions, and is not a misstatement of the law." Baltimore & Ohio

Southwestern Ry. Co. v. Young (Ind.) 54 N. E. 791.

"Contributory negligence that would have barred a recovery by the plaintiff was such negligence as amounts to an absence of ordinary care on the part of the plaintiff." Johnson v. International & G. N. R. Co. (Tex. Civ. App.) 57 S. W. 869.

"The negligence which will prevent a recovery is nothing more than the absence of proper care,—such care as a person of ordinary prudence would exercise under similar circumstances." Barton v. St. L. & I. M. R. R. Co. (Mo.) 14 Am. Rep. 418.

"The failure to use ordinary care by the party injured, if the same contributed to the injury received, would make him guilty of contributory negligence, and be an absolute bar to the recovery of damages for such injuries." Gulf, C. & S. F. Ry. Co. v. Shieder (Tex. Civ. App.) 26 S. W. 509.

"Contributory negligence is where one acts so as to contribute by direct consent to, or participation in, the wrong complained of." Briant v. Detroit, L. & N. Ry. Co. (Mich.) 62 N. W. 365.

The court, in the majority opinion, speaking of imputed negligence, on page 5 of the typewritten copy, says:

"The rule contended for by the defendant finds support in some jurisdictions, but this court has heretofore rejected the doctrine of imputed negligence in this jurisdiction. * * *"

The court in the majority opinion cites a United States Supreme Court opinion—William Miller, Adm'r, v. Union Pacific Railway Co., 290 U. S. 227, 54 S. Ct. 172, 78 L. Ed. 285, in support of the above statement, wherein it is said:

"That the negligence of the driver of a vehicle is imputed to a passenger * * * (is) distinctly repudiated by this court."

Observe the trial court in the instant case said in instruction No. 12:

"However, you are instructed that the negligence, if any, of the driver McLain is not imputable to the plaintiff. * * *"

The above statements of the trial court and contention in the majority opinion, that contributory negligence of the driver cannot be imputed to a passenger or occupant riding in a car under the facts and circumstances in the instant case, are not sustained by any authorities, nor are they sustained by the court in the Miller Case cited. Said contention is simply an ingenious abstraction from the well-settled rule that contributory negligence of the driver under

the facts and circumstances in a given case may be imputed to a passenger.

The question now before this court for adjudication is: "Whether or not the plaintiff under the facts and circumstances as shown by the record in the instant case was guilty of contributory negligence."

The facts and circumstances in the Miller Case are as dissimilar from the facts and circumstances in the case at bar as day is from night. In the Miller Case, supra, the husband was driving the car and his wife was riding with him when the accident occurred. The court held the husband guilty of contributory negligence in the following language:

"Contributory negligence on his part was clearly established under the general rule frequently stated by this court. We need do no more than refer to the case of Northern Pacific Railroad v. Freeman, 174 U. S. 379, where a person killed by a moving train at a railroad crossing well known to him, with the coming train in full view which he could have seen while 40 feet distant from the track if he had looked, was held guilty of contributory negligence because, putting aside the oral testimony, these facts demonstrated that either he did not look or took the chance of crossing before the train reached him. 'When it appears,' the court said (pp. 383-384), 'that if proper precautions were taken they could not have failed to prove effectual, the court has no right to assume, especially in face of all the oral testimony, that such precautions were taken. * * * Judging from the common experience of men, there can be but one plausible solution of the problem how the collision occurred. He did not look; or if he looked, he did not heed the warning, and took the chance of crossing the track before the train could reach him. In either case he was clearly guilty of contributory negligence.' Authority for this view was found especially in Railroad Co. v. Houston, 95 U. S. 697, 702."

The husband was found guilty of contributory negligence because he failed to exercise that care and caution required of a prudent person. The court in said case, speaking of the wife, said:

"In the present case, as already appears, the burden was sustained as to the husband. It was not sustained as to the wife. As to her, there is an entire absence of evidence on the point. * * *

"Here the wife was not in control of the movement of the automobile. She could only note the danger, warn her husband, and urge him to stop. She may have done so, and he, misjudging the situation or taking the chance, have gone forward nevertheless. Or she may have seen the approaching

train, observed that her husband was also aware of the fact and, relying upon her knowledge of his habits and character, trusted him, with good reason, until it became too late to interfere. * * *"

The court found the wife, who was riding with her husband, not guilty of negligence, for the reason that the evidence clearly shows that "the wife was not in control of the movement of the automobile."

The courts now generally agree and hold that the liability for injuries sustained by one riding in the vehicle or car of another, in case of accident, depends on the injured person's control or right of control of the actions of the driver, so as to constitute in fact the relation of principal and agent or master and servant, or his voluntary, unconstrained, noncontractual surrender of all care for himself to the caution of the driver. Shultz v. Old Colony St. R. Co. (Mass.) 79 N. E. 873.

Surely none will say that McLain, the driver, was controlled by the defendant street car company.

In Colorado, etc., R. Co. v. Thomas (Colo.) 81 P. 801, the court held that: Of course, the occupant of the vehicle will not be permitted to recover where it appears that he himself was negligent either in permitting the driver to encounter known dangers, or in failing to use his senses of sight and hearing to discover the perils of the highway.

In the case of Bofil v. New Orleans R., etc., Co. (La.) 66 So. 339, the court said:

"If the relation of master and servant exists between the passenger and the driver—that is to say, if the passenger is the master and the driver is his servant—and the latter's negligence contributes to the injury the former suffers through the negligence of a stranger, the driver's negligence is imputable to the passenger, and the stranger is not liable. * * *"

The above holding makes the passenger the master of the driver.

In Anthony v. Kiefner (Kan.) 150 P. 524, the court held: Again, the authorities are generally agreed that, if two persons are engaged jointly in a common enterprise requiring for its purpose that they use and occupy a conveyance of some sort—a wagon, boat, or other vehicle—in the management and control of which both have equal authority and rights, each assumes a responsibility for his colleague's conduct; and, if either is injured by the negligence of a third party and the concurring negligence of his companion, the mere fact that he was not at the time driving the common conveyance will not enable him to recover of the wrongdoer.

It is a well-settled principle of law that:

"The occupant of a vehicle will not be permitted to recover where it appears that he himself was negligent either in permitting the driver to encounter known dangers, or in failing to use his sense of sight and hearing to discover the perils of the highway." Colorado, etc., R. Co. v. Thomas (Colo.) 81 P. 801, and many other cases too numerous to mention.

In Whittaker v. City of Helena (Mont.) 35 P. 904, the court, in the syllabus thereof, said:

"The negligence of the owner and driver of a private conveyance is imputable to one who is voluntarily riding with him, and the latter cannot recover damages against a city for injuries caused by its negligence, where the negligence of such driver contributed thereto."

In the body of the opinion, the court said:

"One voluntarily in a private conveyance voluntarily trusts his personal safety in the conveyance to the person in control of it. Voluntary entrance into a private conveyance adopts the conveyance, for the time being, as one's own. and assumes the risk of the skill and care of the person guiding it. * * * There is a personal trust in such cases, which implies an agency. So, several persons voluntarily associating themselves to travel together in one conveyance not only put a personal trust in the skill and care of that one of them whom they trust with the direction and control of the conveyance, but appear to put a personal trust each in the discretion of each against negligence affecting the common safety. * * *"

The court further said:

"In Railroad Co. v. Miller, 25 Mich. 274, a case involving the question whether or not the negligence of the driver of a private team was imputable to one who was riding voluntarily with the driver, Mr. Chief Justice Christiancy, speaking for the court, says: 'The materiality of this question must depend upon another,—whether the plaintiff's own negligence or that of Eldridge, who was driving the team, contributed to the injury, within the meaning of the generally settled rule upon this subject; for, as she was riding with Eldridge, the owner and driver of the team, any negligence of Eldridge equally affects her rights in this suit, as was properly held by the court.' These authorities all hold that if the negligence of the party injured, or of his driver, which is imputed to him, materially contributed to the injuries, he cannot recover, although the party com-

plained of has not been free from negligence. * * *"

## Intoxication.

Every person is bound to an absolute duty of exercising his intelligence to discover and avoid dangers that may threaten him, and intoxication voluntarily produced can constitute no excuse for a failure fully to perform this obligation. He is bound to exercise his intelligence and activity in full measure, and if it appears that from voluntary drunkenness he has deprived himself of capacity so to do, and that as a result he has suffered an injury, he will be denied legal redress therefor. Little Rock Ry., etc., Co. v. Billings, 173 Fed. 903, and many cases cited both federal and state too numerous to mention.

"But unless his condition is known he can derive no benefit from the fact that he is incapicated by reason of intoxication." 20 R. C. L. 130, sec. 107, Negligence.

"Intoxication does not generally deprive a person entirely of his senses or his judgment, and, although it is a matter of common knowledge that a man is not so prudent when he is drunk as when he is sober, the vital question remains, as always, did he use the ordinary care of a sober man? * * * But the fact of intoxication in no degree lessens the amount of care which he is required to take and he is held to equal prudence with a sober person in like circumstances." Barrows on Negligence, p. 77, sec. 31.

"One voluntarily intoxicated is chargeable with the same degree of care to avoid injury as a sober person of ordinary prudence under like circumstances." Johnson v. Louisville & N. R. Co. et al. (Ala.) 16 So. 75, syll. No. 2.

"If plaintiff's husband because of drunkenness was unfit to drive car and plaintiff knew it and rode in automobile driven by him as guest, her husband's negligence became her negligence." Chapman v. Powers (Miss.) 116 So. 609, syll. No. 4.

We invite a careful reading and analysis of Miller v. Union Pacific Railway Co., supra, cited in the majority opinion, wherein it is claimed:

"That the rule or doctrine of contributory negligence of a driver of a car cannot be imputed to a passenger, occupant or guest, and that said rule has been distinctly repudiated by the federal and state courts in this country."

Observe that Little v. Hackett, 116 U. S. 366, is cited in support of the above contention. Observe also that the opinion in Little v. Hackett was written by Mr. Justice Field of the Supreme Court of the United States. Whether or not "the neg-ligence of the driver of a car can be imputed to a passenger, occupant, or guest, riding in the car," we quote the words of the Justice in said opinion as follows, to wit (p. 371):

"That one cannot recover damages for injury, to the commission of which he has directly contributed, is a rule of established law and a principle of common justice. And it matters not whether that contribution consists in his participation in the direct cause of the injury or in his omission of duties which, if performed, would have prevented it. If his fault, whether of omission or commission, has been the proximate cause of the injury, he is without remedy against one also in the wrong.

"It would seem that the converse of this doctrine should be accepted as sound—that when one has been injured by the wrongful act of another to which he has in no respect contributed, he should be entitled to compensation in damages from the wrongdoer. And such is the generally received doctrine, unless a contributory cause of the injury has been the negligence or fault of some person towards whom he sustains the relation of superior or master, in which case the negligence is imputed to him, though he may not have personally participated in or had knowledge of it; and he must bear the consequences." Little v. Hackett, 116 U. S. 371.

Justice Field first states the rule of contributory negligence and then announces what he denominates the converse of (the rule of contributory negligence) this doctrine. Observe, Justice Field says:

"That one cannot recover damages for an injury, to the commission of which he has directly contributed, is a rule of established law and a principle of common justice."

The distinguished jurist not only informs us that contributory negligence is a rule established by law, but also tells us that it is a "principle of common justice."

In Kinnie v. Town of Morristown, 172 N. Y. Supp. 21, at page 24, the court said:

"If four sober men embark in a car on a general drinking scheme, and each drinks with, participates in, and is the cause of the intoxication of the others, they are all equally to blame if the car is managed by a drunken person.

"It is suggested that Howland had some business at Canton but the party went to Ogdensburg on a pleasure trip, and when they left * * * there is evidence tending to show that they were all more or less intoxicated, and were using the car in going from place to place for the purpose of having a drinking time. If Howland had been in-

jured and the accident had been brought on by his intoxication, it would be clear that there could be no recovery. Under the circumstances, if they were all parties to the drinking, and all were participating in the intoxication of Howland, if he were intoxicated, each would be as much responsible for the car being driven by a drunken person as the driver would be. It was therefore not very material who drove the car, for, if the injury resulted from the intoxication of the chauffeur, it should be treated as the common act of all, and should prevent any one of the intoxicated persons from recovery. * * *"

In the Kinnie Case, the court held where persons embark in a car, and if they were all parties to the drinking and all were participating in the intoxication with the driver, if he were intoxicated, each would be responsible for the car being driven by a drunk person, as the driver would be, and it is not very material who drove the car, for if the injury resulted from the intoxication of the chauffeur, it would be treated as the common act of all.

"If it is manifest that the host from drunkenness, or other cause, is unfit to drive the car, and that his driving will endanger the life and limbs of others, and the guest is aware of that condition of affairs, and voluntarily rides in the car with such a host, the negligence of the latter becomes the negligence of the guest." See Chapman v. Powers (Miss.) 116 So. 609.

In the Chapman Case, supra, the court construed the exception to the general rule just stated, and held, if it is manifest that the host, from drunkenness or other cause, is unfit to drive the car, and that his driving will endanger the life and limbs of others, and the guest is aware of that condition of affairs and voluntarily rides in the car with such a host, the negligence of the latter becomes the negligence of the guest.

It is a matter of common knowledge that the drinking of intoxicating liquor has certain effects upon persons in their conduct in driving or managing an automobile.

We consider the statements of law in the above cases applicable to the case at bar, and the court should have instructed the jury in accordance therewith.

The defendant herein repeatedly, time and again, requested the trial court to instruct the jury as to the various elements involved in the rule of contributory negligence as shown and upheld by both federal and state courts too numerous to mention. But said requested instructions were refused by the trial court.

The refusal of the court to give said instructions under the facts and circumstances in the instant case was reversible error.

Having set out the pertinent facts as shown by the record, supra, in conclusion will say:

The evidence does not show any primary negligence on the part of defendant.

The relation of master and servant is not shown to exist between plaintiff or his driver and the defendant.

The evidence shows clearly that defendant had established at said highway crossing an electric bell which automatically rings; and a signal lighting system as a warning to persons on the highway, and that both systems were in perfect operation at the time of the accident.

McLain, driver of the car, specifically testifies that he saw the light and heard the bell ring.

Plaintiff and McLain sustain no official relation whatsoever to the defendant. They were just two ordinary drunken pals shuttling up and down and across defendant's railroad tracks buying and drinking whisky, which they had purchased at various bootlegging joints situate along the public highway.

The plaintiff herein voluntarily engaged in a drunken and ludicrous spree with McLain, his chauffeur, and continued said conduct from 1 o'clock p. m. into the night when the accident occurred.

The plaintiff herein voluntarily and of his own will surrendered all care for himself to the caution of the driver whom he had selected.

Under the exception to the general rule, where there is reason to suspect the want of care, skill, or sobriety of the driver of an automobile, and said fact is known, or could be ascertained by the guest by using due diligence, the negligence of the driver becomes the negligence of the guest.

Where two or more persons embark in a car on a general drinking scheme and drink with each other, and the driver of the car becomes incapacitated to efficiently drive the car because of the effect of intoxicating liquor, the negligence of the driver becomes the negligence of the guest because the guest was equally to blame if the car is managed by an intoxicated person.

The majority opinion does not set out or discuss the pertinent testimony adduced at the trial.

Said opinion should be rejected and the case remanded for new trial.

The evidence in the instant case shows that the plaintiff and McLain, driver, had equal authority in the management and control of the car in which they were riding.

Plaintiff's and McLain's drunken condition and recklessness no doubt was the procuring cause of the accident and injury received.