## BLACKLEY v. POWELL et al.

### No. 3540.

Circuit Court of Appeals, Fourth Circuit.

Jan. 8, 1934.

Clyde A. Douglass, of Raleigh, N. C. (Walter R. Jones and J. Chesley Sedberry, both of Rockingham, N. C., on the brief), for appellant.

L. R. Varser, of Lumberton, N. C. (R. A. McIntyre and Ozmer L. Henry, both of Lumberton, N. C., on the brief), for appellees.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

This is an action for damages for personal injuries, under the Federal Employers' Liability Act (April 22, 1908, c. 149, 35 Stat. 65, as amended [45 USCA §§ 51–59]), originally instituted in the superior court of Richmond county, North Carolina, and properly removed to the District Court. It was brought by appellant, hereinafter called plaintiff, a locomotive engineer, who, while preparing at Andrews, S. C., for a run to Savannah, Ga., fell into an unguarded turntable pit in the Andrews yards at about 2 a. m. on the morning of January 14, 1932. The plaintiff charged negligence on the part of the defendant receivers in failing to maintain adequate

458

lights at the place of the injury, and in placing the engine which plaintiff was first to inspect and then to operate, so near the unguarded pit that plaintiff, in the course of his inspection, unwarily fell into it, sustaining the injuries complained of. At the close of all the evidence, the trial judge directed a verdict for defendants on the ground that the accident was attributable to the conduct of the plaintiff in going into the neighborhood of the pit, of whose existence he must have been aware, without using a torch or light, with which he had been supplied. This appeal presents the single question of the propriety of that direction.

The accident occurred about half a mile from the main track leading from Hamlet, N. C., to Savannah, Ga., at a place where there had formerly been more extensive yards, a roundhouse, railroad shops, and cinder pits. There was also a turntable in this yard, which was operated in connection with the rest of the plant. In 1928, four years before the accident, the roundhouse and shops were torn down and the cinder pits filled in, but the turntable remained and was still used to a certain extent. Before 1928, the yards were well lighted, but with the demolition of the main structures, all the lights had been removed, and at the time of plaintiff's injury, the nearest outdoor light to the turntable was located at a sandhouse 500–600 feet away, and was not strong enough to shed any light near the turntable. The yard at this time consisted simply of two parallel tracks, an office, called the mechanical foreman's office, located in a converted box car to the north of the tracks, a water tank, a coal chute, the sandhouse, and the turntable. The tracks ran east and west, and one of them, called the turntable track, ran onto and through the turntable at the east end of the yard. The other track, 20 feet to the north, was called the storage track. About 250 feet west of the turntable, beside the turntable track, was the water tank, and beyond that, still farther west, the two tracks converged and ran into the main line. It is in this direction that the town of Andrews lies, and an engineer coming out from town for a run would approach the mechanical foreman's office, to which it was his duty to report, from the west. He would also be walking toward the turntable. The office, which is about 40 feet north of the storage track, is only about 100 feet northwest of the turntable at the point where it is intersected by the turntable track. The relative location of objects in the yard was shown by careful measurements made by a civil engineer in the defendants' employ.

At 1:45 a. m. on the morning in question, plaintiff came out of Andrews for duty, reported at the office, and awoke his fireman there. He then proceeded towards his engine, which at about 5 p. m. on the preceding day the fireman had "spotted" or left standing on the turntable track, facing west, and a short distance to the west of the turntable pit. Another engine, spoken of as a "dead" engine, was standing on the storage track, abreast or slightly ahead of the engine plaintiff was to operate. Plaintiff testified that he proceeded behind this engine, reached and entered the cab of his engine, and turned on the dynamo and lights in the cab before beginning his inspection. He then descended from the cab on the left, or fireman's, side and began to inspect the tender. He was supplied with a torchlight for this purpose, but did not use it, using instead a flashlight of his own. He testified that he had inspected the left side of the tender and had crossed to the right side, passing around the end of the drawhead in the rear, and, while inspecting the wheels of the rear truck, at the back corner on the right side of the tender, he inadvertently stepped back and fell into the turntable pit, which he did not know was there. The pit was 4 to 4½ feet deep, and plaintiff, because of his injuries, had to be helped out by the fireman, to whom he called. He testified that when he had gotten out of the pit, he observed that the rear of the tender was only about 3 feet from the edge of the pit and that the drawhead was only 6–10 inches from it. There was no guard or rail around the pit. There is little dispute as to these physical facts, except that the fireman, a defendants' witness, stated he had "spotted" the engine so that the rear of the tender was 15–16 feet from the edge of the pit.

Plaintiff had been in the employ of the railway company since 1895, and had been an engineer for nineteen years. His home was in Hamlet, N. C. He admitted he had been running engines into and out of the Andrews yard for fifteen years, but he claimed he had not been there for quite a while, as, after the changes in the yard, it was not on his regular run except for trips at night, when he would come in one night and leave the next night. On this occasion he had come into Andrews from Savannah on a different engine at about 12:50 the previous night. He testified that he had known of the turntable during the time when the roundhouse and shops were still standing, and that he had used it in 1927 or 1928, but that he thought it had been done away with at the time the roundhouse and shops were removed. Since that time, he had

turned engines at the passenger station on the main line. He thus claimed he did not know the turntable was there when he went out to inspect his engine. He also testified that he had never before taken out an engine that had been located near the turntable; that on previous occasions, and specifically on the two occasions when he had operated the same engine within the previous year, the engine had been "spotted" on the storage track at a point near the water tank and consequently about 250 feet from the turntable.

Despite this assertion of unfamiliarity with conditions in the yard in the vicinity of the turntable, after the removal of the roundhouse and the shops, there were undisputed facts from which the inference is unavoidable that the plaintiff had knowledge of the existence and location of the turntable pit, and had become aware of the close proximity of the engine to the pit before he fell into it. He came out from the town to the mechanical foreman's shop at 5 o'clock on the previous afternoon, and, in order to reach the office, he was obliged to walk easterly through the yard towards the pit. He took a seat in the door of the office, which faced the turntable, about 60 feet away at the nearest point. He said that he could not remember that there was any intervening obstruction at the time concealing the pit from one at the office door. While he was sitting there, the engine, according to the fireman's testimony, was "spotted" at the point near the turntable by the fireman, and the engineer was seen by the fireman from the point where the engine was "spotted." The engineer testified that he did not notice the spotting of the engine at the time, but he was able on the following night to walk directly to it from the office without inquiring as to its whereabouts, although, according to his own testimony, it had not been left where it had been placed on his previous trips. Moreover, he passed between the end of the drawhead of the tender and the pit without falling in, although the intervening space, according to his own estimate, did not exceed ten inches.

■ Because of these circumstances, we are of the opinion that the District Judge, notwithstanding the denial of the plaintiff, was justified in assuming that he was aware of the conditions at the point of the accident. The court is not obliged to submit to a jury a theory of an occurrence, which is obviously not tenable, merely because there is some testimony to support it. When the testimony of a witness is contradicted by the physical facts, neither the court nor the jury can be permitted to credit it. McNabb v. Va. Ry.

Co. (C. C. A.) 55 F.(2d) 137; United States v. Diehl (C. C. A.) 62 F.(2d) 343; American Car & Foundry Co. v. Kindermann (C. C. A.) 216 F. 499; F. W. Woolworth Co. v. Davis (C. C. A.) 41 F.(2d) 342; 8 A. L. R. 798 note. Taking the plaintiff's knowledge of the situation into consideration, it follows that the defendants were entitled to a directed verdict. It is true that the railroad yard was unlighted in the vicinity of the pit, and that under some circumstances, it has been held that the failure of a railroad company to warn its employees by lights or otherwise of the existence in a railroad yard of an unguarded pit near which employees may be expected to work at night, is evidence of neglect on its part of its duty to use reasonable care to provide its employees with a safe place to work. Baltimore & O. R. Co. v. Whitacre, 124 Md. 411, 415, 432, 92 A. 1060, affirmed 242 U. S. 169, 37 S. Ct. 33, 61 L. Ed. 228; Padgett v. Seaboard Air Line Ry., 99 S. C. 364, 83 S. E. 633, affirmed 236 U. S. 668, 35 S. Ct. 481, 59 L. Ed. 777; Lusk v. Bandy, 76 Okl. 108, 184 P. 144. Compare Delaware, L. & W. R. Co. v. Koske, 279 U. S. 7, 49 S. Ct. 202, 73 L. Ed. 578. But Congress has recognized and retained in the Federal Employers' Liability Act the doctrine of the assumption of the risk. Southern Railway Co. v. Verelle (C. C. A.) 57 F.(2d) 1008, 1011, and cases cited. The Supreme Court has held that under this rule, the employee assumes not only the dangers normally and necessarily incident to his occupation, but also risks of another sort not naturally incident to the occupation but arising out of the failure of the employer to exercise due care to furnish a safe place to work, provided that the employee has become aware of the defect and the risk arising from it. Seaboard Air Line R. Co. v. Horton, 233 U. S. 492, 504, 34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475.

■ In the application of this rule, it has been held that the risk of falling into an unguarded unlighted pit, while at work in a railroad yard at night, is not an ordinary risk incident to the occupation assumed by an employee so engaged, unless he is aware of the existence of the pit and of the danger to which it gives rise; but, on the other hand, if the employee, through familiarity with the place, is generally aware of conditions, he assumes the risk involved although at the moment he may not be conscious that he is in a location of danger. See cases above cited and also Laub v. San Pedro, etc., R. Co., 47 Utah, 155, 152 P. 467; Haggerty v. Chicago, M. & St. P. R. Co. (C. C. A.) 141 F. 966; South-

ern Pacific Co. v. Gloyd (C. C. A.) 138 F. 388; Wirtz v. Galveston, H. & S. A. R. Co., 63 Tex. Civ. App. 72, 132 S. W. 510. The pending case cannot be distinguished in principle from Delaware, etc., R. Co. v. Koske, 279 U. S. 7, 49 S. Ct. 202, 73 L. Ed. 578, where it was held, as a matter of law, that a railway employee had assumed the risk and could not recover for injuries received when alighting in the dark from an engine in a railroad yard and falling into a ditch there maintained for drainage, with the location and condition of which he was familiar. It is not possible to understand, in the case before us, how the plaintiff could have safely passed behind the engine in the narrow ten inch space between the drawhead and the pit without falling in at that point, unless indeed he saw the pit and took care to avoid an accident; and so we are forced to conclude that despite his knowledge of the existence of the pit he chose to take the risk involved and unfortunately brought himself within the scope of the rule we have discussed.

Affirmed.