## CHICAGO & N. W. RY. CO. v. KELLY.
### No. 9929.

Circuit Court of Appeals, Eighth Circuit.
Nov. 12, 1934.

Alfred E. Rietz, of St. Paul, Minn. (William T. Faricy, of Chicago, Ill., and Warren

Newcome, of St. Paul, Minn., on the brief), for appellant.

Ernest A. Michel, of Minneapolis, Minn. (Tom Davis and Carl L. Yaeger, both of Minneapolis, Minn., on the brief), for appellee.

Before STONE, Circuit Judge, and JOYCE and BELL, District Judges.

BELL, District Judge.

Action by Paul C. Kelly, appellee, against the Chicago & North Western Railway Company, appellant, for damages resulting from personal injuries. From a judgment on a verdict for appellee, this appeal was taken.

The appellant presents four grounds for reversal: (1) Insufficiency of the evidence, (2) misconduct relative to appellee's domestic status, (3) misconduct of counsel in closing argument, and (4) excessiveness of the verdict.

### Insufficiency of the Evidence.

The appellant vigorously contends that the evidence was insufficient to justify submission of the case to the jury, and, therefore, that its motion to direct a verdict should have been sustained; consequently, a comprehensive statement of the facts is necessary.

It is undisputed that the appellee was employed by appellant as a brakeman and that at the time of the accident both were engaged in interstate commerce; that appellee was working on a freight train of sixty-six cars on a run from Council Bluffs to Boone, Iowa; that on arriving at Carroll, Iowa, on the morning of October 24, 1932, while the train was moving very slowly in an easterly direction, he dismounted from the engine on the south side for the purpose of uncoupling the train between the third and fourth cars from the engine so as to set out the three head cars; and that in some manner his left leg was caught under the wheels of the fourth car, was crushed, and amputation seven or eight inches below the knee followed.

There is a dispute as to the manner in which the accident occurred. The appellant contends that the appellee, in violation of the rules and regulations of the company, went between the cars while the train was in motion, was struck and thrown beneath the wheels and injured. The appellee contends that as the third car was passing, it became apparent that the train would not stop so that the coupling between the cars mentioned would be near at hand and that he therefore, in ac-

cordance with his duties and the practice in railroading, undertook to board the third car so as to dismount when the train stopped and be at the proper place to make the uncoupling; that in attempting to board the car he placed his right foot in the stirrup and simultaneously caught the handhold on the south side of the car at the west end; that the handhold was loose at one end, gave way, and that he was thereby thrown between the cars and under the wheels as a result of which he was injured. Several witnesses, in ten to twenty minutes after the accident, saw the handhold hanging perpendicularly by the rear fastening bolt. The nut was off the bolt at the forward end and the other end was slightly loose. The explanation of the appellant of this condition was that one Hosler, engineer on a nearby switch engine, immediately after the accident, deliberately removed the nut at the forward end of the handhold and loosened the nut at the other end. Hosler died prior to the trial.

Appellant contends that the evidence shows conclusively that the handhold was in good condition until after the accident. In support of this contention it presented testimony that the car was inspected at Omaha, Neb., the day before, and again at Missouri Valley, Iowa, the night of the accident. Bolitho testified that he used the same handhold that night at Missouri Valley which is seventy-two miles west of Carroll and that it was not loose then. There was evidence that the nut had been riveted on the bolt.

Appellant further contends that the defective condition in which the handhold was found was due to the removal of one nut and the loosening of the other after the accident. This is supported by testimony of witnesses Hall, working foreman in appellant's car repair shop at Carroll, and Hanson, master car builder. Hall made three inspections of the car on the morning of the accident and was accompanied on the third inspection by Hanson and Peterson, the yardmaster. At this time the car was thoroughly inspected and an unsuccessful search at the place of the accident was made for the missing nut. An examination of a nearby tool box was made for a tool that would fit the nut, but none was found. They then went to the roundhouse and examined the switch engine to see if there were indications of it having been in an accident, but none were found. However, in the tool box on the engineer's side of the cab, a large adjustable monkey wrench was discovered. This wrench was so adjusted as to

fit the missing nut. On the front jaws of the wrench were indications of paint of the kind on the car. Fresh marks indicating that the nut had been turned were discovered on the foot of the handhold where the nut was missing. The paint immediately back of the forward end of the handhold had been disturbed and there was no evidence that the handhold had shaken up and down. The nut at the rear end of the handhold was loosened two or three threads. The paint on this nut bore such marks as are made by the application of a wrench. An opinion was given that the bolt at the forward end had been riveted so that the nut could not have shaken off and could not have been removed without the application of considerable force. Such was the evidence to show that Hosler, after the accident, had the opportunity to and did remove the nut. According to the testimony not one of the many witnesses, who reached the scene of the accident in a comparatively few minutes after it happened, saw Hosler remove the nut.

There was substantial evidence from which the jury might have concluded that if Hosler removed the nut, he did it in the presence of others. Within twenty minutes after the accident, eight persons appeared on the scene; Beshey, a trespasser who had been riding on the train; Hosler, engineer of the switch engine; Case, engineer on the train; Huddleston, the fireman; Bolitho, rear brakeman; Masterson, the conductor; Oliver, fireman on the switch engine; and Daley, foreman of the switching crew. Other witnesses appeared later.

The testimony of the appellee and of a number of the witnesses for appellant is illuminating in this connection. The appellee stated that he called for help and tried to signal the members of the train crew with his lantern. Day was just breaking. Beshey, who had been riding between the first and second cars at the head of the train, was the first to come and appellee requested him to get the engineer of the train. After he sent Beshey for help, "it was not over a minute and a half until the engineer of the switch engine and my own engineer and fireman were right there; one came right behind the other." He further testified, "After the accident the first man that came to me was unknown to me. The first employee that came to me was Gene Hosler, the engineer of the switch engine. The next men were Fred Case and Guy Huddleston,—they came right together, as I remember. The time that elapsed between the time Mr. Hosler came and Fred Case and Guy

Huddleston came, I would say was perhaps thirty seconds. It seems like they came right together." Beshey testified that when he saw appellee fall two car lengths away he got down from the car and ran toward him; that he then called for help and ran toward the engine of the train; that he returned and a man whom he did not know (Hosler) came over to appellee, stooped down, and talked to him. Appellee testified that when Hosler came he said, "Good God, Paul, how did this happen?" and that he (appellee) replied, "The grabiron on the car let loose, throwing me under the wheels." Several witnesses testified that appellee made a similar statement to them immediately on their arrival after the accident.

Engineer Case was not called as a witness, nor was the failure to do so explained. Huddleston stated that he heard about the accident in three to five minutes after the train stopped and went with Case to see appellee; that when he got there Beshey was with him; that he went toward the rear of the train and fifteen or twenty cars back he met Bolitho and told him what had occurred; that he went some distance further to the rear, met Masterson, and returned with him and found Bolitho with the appellee; that he examined the car and saw the handhold hanging from the rear bolt. When Bolitho reached appellee, Case was there but Hosler was not. Masterson said that when he arrived Case was there but Hosler was not present. He also saw the handhold hanging by one end.

The testimony of the switch engine crew is significant. The switch engine was standing near the engine on the train and at least five car lengths from where appellee lay. Oliver, the fireman, stated that he was on the engine when Hosler got off and left it; that Hosler returned in twelve to fifteen minutes and told him of the accident; that he then went to see appellee; and that when he returned to his engine eight or ten minutes later Hosler was there. Dyer of the switching crew stated that Hosler called to him and told him of the accident and that he went within twelve to fifteen feet of appellee; then waited four or five minutes when Daley came and together they went to where appellee lay. Bolitho was there at that time. Dyer returned to the switch engine and both Hosler and Oliver were there. Appellee and Hosler were acquaintances but had never visited each other and were not intimate friends.

All of the witnesses enumerated above, except appellee, were placed on the stand by

appellant. The handhold, the bolt and nut from the rear end thereof, and the bolt from the forward end were received in evidence. On rebuttal an expert on metallurgy, a professor from the University of Minnesota, testified that in his opinion the bolt had not been riveted and that if it had been and a nut removed by force, the end threads would have presented a brighter appearance; that the threads were oxidized and dark; that with the bolt in the condition exhibited a nut on it could work loose; that the dome on the end of the bolt was rounded and had not been struck and flattened so as to rivet it.

From this testimony, it is clear that appellant's motion for a directed verdict properly was denied. The evidence would sustain a verdict in its favor, but certainly it was not so conclusive as to require such a verdict. The jury was not obliged to accept as absolutely true the testimony that inspections of the car had been made and that Bolitho had used the same handhold at Missouri Valley, seventy-two miles west of Carroll, any more than it was obliged to accept the testimony of appellee that the handhold was defective. The jury might have believed that the handhold was perfect at Missouri Valley and at the same time believed that the nut was shaken off in the seventy-two miles of travel from Missouri Valley to Carroll. Neither was the jury compelled to accept the inferences drawn by appellant from the so-called "physical evidence." Appellant presented every procurable witness, except Case, and they all testified to seeing the handhold in its defective condition in from ten to twenty minutes after the accident. Apparently Hosler made but one trip from the switch engine to the place of the accident; and, if he used the large adjustable wrench to remove the nut as claimed by appellant, he took it with him when he first went. There is no evidence to show that he did so and to hold that he did would require an unreasonable assumption. Beshey was at the place of the accident when Hosler first arrived. The evidence would have justified the jury in finding that Case and Huddleston came within thirty seconds thereafter; that in a few minutes other witnesses arrived; and that some one, other than Hosler, was present during the entire period from the time Beshey arrived until all these witnesses had seen the defective condition of the handhold and until appellee was carried away. Appellant's position must be that Hosler, after discovering what had happened, returned to the switch engine, procured the wrench, went back to the defective car, removed one nut and loosened another, then returned the wrench to the tool box of the switch engine, when numerous employees of appellant were at or near the scene of the accident. None of them saw such prompt activity on the part of Hosler; or, if they did, they deliberately testified falsely. Appellant's own testimony shows that Oliver was on the switch engine and it is unbelievable that Hosler returned to the engine, took the wrench from the tool box thereon in the presence of Oliver, and later returned it in the presence of Oliver without him knowing it; and it is just as unbelievable that appellant would not have developed such testimony if it existed. In short, appellant's theory really demands that the jury believe that as soon as Hosler reached the appellee, who had been unexpectedly and dangerously injured and was lying on the ground at the place of the accident, he conceived the idea of manufacturing a cause of action, or that such a scheme was imparted to him by appellee and that he responded by doing the things with which he is charged. The jury might have believed him guilty of such improbable conduct, but it was not within the province of the court to instruct the jury to believe it.

■ Under the Safety Appliance Act, § 4 (45 USCA § 4), it was the absolute duty of the appellant to provide and maintain safe and secure handholds on its train, and, if it failed to do so, it was liable for damages proximately resulting therefrom. St. Louis, I. M. & S. Railway Company v. Taylor, 210 U. S. 281, 28 S. Ct. 616, 52 L. Ed. 1061; Texas & Pacific Railway Company v. Rigsby, 241 U. S. 33, 36 S. Ct. 482, 60 L. Ed. 874; Chicago, G. W. Railway v. Schendel, 267 U. S. 287, 45 S. Ct. 303, 69 L. Ed. 614. The proof that appellant performed this duty was not conclusive; to the contrary, the evidence that it violated this duty was both substantial and convincing. Therefore, the contention that there should have been a directed verdict cannot be sustained.

### Misconduct Relative to Domestic Status.

■ This contention presents the alleged misconduct of appellee and his counsel with reference to the appellee being married and the father of two children. In his opening statement counsel said that the appellee "is married and has two children." There was an objection, whereupon counsel then stated, "If the court please, I do not think that it is prejudicial in the slightest degree. I think a

man has a right to show who he is and what he is." The ruling of the court was, "Well, the record will show what the statement is," to which there was an exception.

When the appellee was placed on the stand, this occurred:

"Q. Are you married or single? A. I am married and have two children.

"Mr. Rietz: Just a moment. We ask that that be stricken out, your Honor, as prejudicial.

"The Court: It may be stricken out.

"Mr. Rietz: I take an exception, your Honor, to the statement having gone before the jury.

"The Court: Of course, you are allowed an exception."

In the examination of the wife of appellee, the following occurred:

"Q. Will you please state your full name? A. Alice M. Kelly.

"Q. You are the wife of Paul Kelly, the plaintiff? A. Yes, sir.

"Q. And you live with him and your children at Boone, Iowa? A. Yes, sir.

"Mr. Rietz: That is objected to as highly prejudicial, if Your Honor please. We have objected to that several times, and the Court has sustained the objection.

"Mr. Davis: Well, I would like to be heard on that, if there is any doubt about it. I think it is proper testimony, going to the extent of the damage. This man has a perfect right to show who he is, that he has children, and that he has to support his children, that he has to earn a livelihood.

"Mr. Rietz: If that is true, then I have the right to show that this man has collected $12,500.00 on his insurance for the leg.

"The Court: Well, gentlemen, this man— the objection is sustained."

In the closing argument of counsel for appellee, the following occurred:

"Now, let us say that some of this jury will say: 'Well, we will say that he could earn one-third of that,—we will say that he could earn one-third of that at some other work'. Before you take that away from Paul Kelly, I ask you, or any man or woman on this jury, to say, 'What will he do? Where will he go in the economic world, where there are millions of men out of work? Where will he turn, a crippled man, to get work and earn a livelihood, and support his family?' The fact of the matter is that today,—

"Mr. Rietz: (interrupting) Just a minute.

"Mr. Davis: (continuing) They have taken away from him,—

"Mr. Rietz: (interrupting) Just a minute. We take an exception to counsel's reference to the family.

"The Court: An exception may be allowed."

In the closing argument of counsel for appellee, we also find:

"I want to say to you that if the Northwestern Railroad Company would give that man back his leg, give him back his ability to work, give him back the capacity to go to his home, give him back the capacity to take care of his children, take away from him the horror and anxiety, the pain, the suffering and the deformity, that he would take every dollar of that thirty-four thousand dollars and hurl it back into the face of the Northwestern Railroad Company as a worthless rag.

"Now, you take this case and give this man what he is entitled to. I thank you.

"Mr. Rietz: I will note an exception, if Your Honor please, to Mr. Davis' remarks.

"The Court: An exception will be allowed."

The court made no mention of the subject-matter of these objections in the charge to the jury.

The admission of testimony showing family responsibilities usually has been held error. Pennsylvania Company v. Roy, 102 U. S. 451, 459, 26 L. Ed. 141; Lacorazza v. Cantalupo (C. C. A.) 210 F. 875; Southern Pacific Company v. Ralston (C. C. A.) 67 F. (2d) 958; Bahr v. Northern Pacific Railway Company, 101 Minn. 314, 112 N. W. 267. Whether the admission of such testimony is reversible error largely depends on whether it has created passion and prejudice in the minds of the jury. Courts should exercise great caution in setting aside judgments because of inadvertent remarks made by litigants or counsel during a hotly contested trial, even though improper, unless it clearly appears that they aroused the sympathy or prejudice of the jury and influenced the verdict.

In this case the testimony of the wife, to which there was no objection, properly revealed that appellee was married. Therefore, the objection to the statement that appellee had a wife is not open to attack. The question involved is the propriety and effect of

the evidence and argument concerning the children. If the fact that appellee was the father of children had been inadvertently disclosed during the trial by a chance remark of counsel in his opening statement or in his closing argument, or by a voluntary remark of a witness, in such a manner as not to arouse the passion of the jury, it would not justify a reversal. The initial statement of counsel might be disregarded as inadvertent and particularly so if the court had ruled that the statement was improper and, if necessary, added a reprimand to counsel. The court virtually denied the objection to this remark in the opening statement of counsel which might have inspired the answer of the plaintiff that he had two children. However, after this answer of appellee had been ordered stricken by the court, counsel should have observed the ruling; but, with the very next witness counsel repeated the error by his question to the wife, "You live with him and your children at Boone, Iowa?" Obviously, the purpose of the question was to emphasize the existence of the children. When an objection was made, counsel further added emphasis by saying, "I think it is proper testimony, going to the extent of the damage. This man has a perfect right to show who he is, that he has children, and that he has to support his children, that he has to earn a livelihood." The situation presents an aggravated instance of counsel proceeding in defiance of the rulings of the court. Furthermore, counsel in his closing argument twice referred to the matter. Almost the last thought he presented for the consideration of the jury was, "Give him back the capacity to care for his children." The testimony in the case and statements of counsel in this connection cannot be approved. In the case of the Pennsylvania Company v. Roy, supra, the court said:

"There was, however, an error committed upon the trial, to which exception was duly taken, but which does not seem to have been remedied by any portion of the charge appearing in the bill of exceptions. The plaintiff was permitted, against the objection of the defendant, to give the number and ages of his children,—a son ten years of age, and three daughters of the ages, respectively, of fourteen, seventeen, and twenty-one. This evidence does not appear to have been withdrawn from the consideration of the jury. It certainly had no legitimate bearing upon any issue in the case. The manifest object of its introduction was to inform the jury that the plaintiff had infant children dependent upon him for support, and, consequently, that his injuries involved the comfort of his family. This proof, in connection with the impairment of his ability to earn money, was well calculated to arouse the sympathies of the jury, and to enhance the damages beyond the amount which the law permitted; that is, beyond what was, under all the circumstances, a fair and just compensation to the person suing for the injuries received by him. How far the assessment of damages was controlled by this evidence as to the plaintiff's family it is impossible to determine with absolute certainty; but the reasonable presumption is that it had some influence upon the verdict."

A statement by counsel for appellant cannot be ignored. With equal disregard of proper conduct, and contrary to the ethics of his profession, counsel stated, "If that is true, then I have the right to show that this man has collected $12,500.00 on his insurance for the leg." There was no excuse or justification for this highly improper remark, but it does not justify the court in sustaining a judgment that should be reversed because of testimony and remarks persistently made by counsel for appellee and calculated to influence the jury.

### Misconduct in Closing Argument.

■ In addition to statements of counsel for appellee relative to domestic responsibilities, appellant complains of many other remarks of counsel in his argument to the jury, such as: "The silliest and most dishonest and contemptible defence that I have seen in thirty years," and "I say that from the very minute this man lay in the hospital, this railroad started out to try and defraud him," and "claim agent's trickery," and "Built up defence," and the appellant was "hiding behind a dead man," and "suspicion haunts a guilty man," and others of a similar nature.

Counsel in addressing the jury should confine their remarks to a discussion of the issues in the case and the evidence in the record; opposing counsel should except to the remarks claimed to be improper; and trial judges should exercise vigilance to prevent improper remarks and appeals to passion and prejudice. New York Central Railroad Company v. Johnson, 279 U. S. 310, 49 S. Ct. 300, 73 L. Ed. 706; Union Electric Light & Power Company v. Snyder Estate Company (C. C. A.) 65 F.(2d) 297.

In this case no objections were made or exceptions taken at the time of the argument.

Opposing counsel did not interrupt or request the court properly to instruct the jury pertaining to such remarks. Appellant had a record made of counsel's entire argument when no record of the argument of appellant's counsel had been preserved. We are asked to determine the prejudicial character of this argument without knowing what preceded it. Such procedure would enable a defeated party, after the case is ended and no objections entered, to select from a long argument made at the close of a trial, apparently objectionable features and present them as grounds for a new trial or reversal on appeal. Courts are not precluded from correcting error involving a verdict influenced by passion and prejudice, even though exceptions have not been taken [New York Central Railroad Company v. Johnson, 279 U. S. 310, 49 S. Ct. 300, 73 L. Ed. 706; Aetna Life Insurance Company v. Kelley (C. C. A.) 70 F.(2d) 589, 93 A. L. R. 471]; but the rule requiring that the record be protected is sound on principles to which we generally should adhere. This case was more than vigorously contested; it was fought with vehemence and bitterness. Each party was charging the other with fraud. Caustic language frequently enters into the trial of such cases. Counsel was entitled to present his case with force and vigor, but he was not justified in an impetuous denunciation of the appellant, its attorneys and agents, or an exhortation appealing to the passion and prejudice of the jury. The argument is open to criticism, and under some circumstances would justify reversal; but, on the record presented, a reversal on this ground alone would not be warranted.

### Excessiveness of Verdict.

Appellant contends that the verdict was excessive. The rule that this court will not review the action of the trial court in granting or denying a motion for a new trial for error of fact has long been settled; and frequently has been applied when the ground of the motion was that the damages awarded by the jury were excessive or were inadequate. Fairmount Glass Works v. Cub Fork Coal Company, 287 U. S. 474, 53 S. Ct. 252, 77 L. Ed. 439; Southern Railway Company v. Walters (C. C. A.) 47 F.(2d) 3; Grand Trunk Western Railway Company v. Heatlie (C. C. A.) 48 F.(2d) 759. Therefore, this question is not open to our consideration.

The judgment is reversed and the case remanded for a new trial.