## CHAMBERS v. SKELLY OIL CO.

### SKELLY OIL CO. v. CHAMBERS.

#### Nos. 1432, 1433.

Circuit Court of Appeals, Tenth Circuit.
Jan. 19, 1937.

854

**BRATTON, Circuit Judge, dissenting in part.**

---

W. L. Cunningham, of Arkansas City, Kan. (Austin M. Cowan, C. A. McCorkle, J. D. Fair, W. A. Kahrs, Robert H. Nelson, and R. E. Angle, all of Wichita, Kan., on the brief), for Chester W. Chambers.

Glenn Porter, of Wichita, Kan. (H. W. Hart, Enos E. Hook, and Getto McDonald, all of Wichita, Kan., on the brief), for Skelly Oil Co.

Before PHILLIPS, McDERMOTT, and BRATTON, Circuit Judges.

PHILLIPS, Circuit Judge.

A Mack gasoline truck owned by Skelly Company and a Pontiac coupe owned by Chambers collided on the public highway in Greenwood County, Kansas. The truck was being driven by Skelly Company's employee and the coupe by Chambers. Both the truck and coupe were damaged and Chambers sustained personal injuries. Skelly Company brought an action against Chambers in the District Court of Sedgwick County, Kansas, to recover the sum of $2,500.00 damages to its truck, alleging the collision was caused by the negligence of Chambers.

Chambers filed an answer and cross-petition in which he denied negligence on his part, alleged the collision was due to the negligence of Skelly Company's employee and demanded damages in the sum of $50,000.00 for personal injuries and damage to his coupe.

Within the time it was required to answer or plead to the cross-petition, Skelly Company duly removed the cause to the District Court of the United States for the District of Kansas on the ground of diversity of citizenship. A motion to remand was denied.

At the close of the evidence the trial court directed a verdict in favor of Skelly Company on the cross-petition and submitted the issues raised by the petition and answer to the jury. The jury returned a verdict in favor of Skelly Company for $1.00.

Skelly Company filed a motion for a new trial on the ground that the undisputed evidence showed it had suffered damages in the sum of $2,216.00. The motion was overruled and judgment entered in favor of Skelly Company for $1.00 and costs.

Both parties have appealed.

■ Under the Kansas procedure a cross-petition is a petition against the plaintiff who becomes in effect a defendant thereto. Under a state of facts similar to those in the instant case Judge McDermott, in an exhaustive opinion, held the removal proper. See San Antonio Suburban Irrigated Farms v. Shandy (D.C.Kan.) 29 F.(2d) 579. For the reasons there stated we hold the motion to remand was properly denied. [1]

The collision occurred October 3, 1934 on U. S. Highway 54, between Eureka and Eldorado, Kansas. The highway runs east and west and at the place of the accident was paved with an oil mat. At the time of the accident the truck was proceeding east and the coupe west. Just prior to the accident Chambers came over the brow of a slight hill which inclines to the west. At the extreme brow of the hill there is a curve of four or five degrees to the north. The collision occurred at a point about two hundred fifty feet westerly from the brow of the hill. The truck and its trailer were between thirty-five and forty feet in length. The truck with its load weighed between seventeen and eighteen tons. The coupe weighed about twenty-nine hundred pounds.

---

[1] See, also, Yale Law Journal, vol. XIV, No. 8, P. 1479.

The driver of the truck testified to these facts. The coupe approached the place of the accident at a speed of about seventy miles per hour on the north side of the road. Just before the accident it turned to the south side of the road, swerved back to the north side of the road and then turned back to the south side of the road and collided with the left front end of the truck. The truck had been on the south half of the road, travelling at a speed of thirty-two to thirty-three miles per hour, for more than a quarter of a mile westerly from the place of the accident. When the truck driver observed the coupe turning toward the south side of the oil mat, he slowed the truck down to ten or twelve miles per hour and turned the truck off the oil mat and toward the south ditch of the highway.

Chambers testified to these facts. Chambers noticed the truck shortly after he came over the brow of the hill. Chambers was driving about forty-five miles per hour. The truck swerved over onto the north side of the highway a distance of about three or four feet over from the center line and then turned back toward the south side of the road. Chambers thought the truck would get back to its side of the road. Chambers turned the coupe as far over on his side of the highway as possible. About eighteen inches of the coupe collided with the bumper, fender and front wheel on the left side of the truck. The only effort Chambers made to avoid the accident was to pull over on his side of the road as far as he could and take his foot off the accelerator.

A number of disinterested witnesses, including a division highway supervisor, an under-sheriff of Greenwood County, the chief of police of Eureka, and a highway worker, examined the physical surroundings at the scene of the accident on October 3, 1934, shortly after it occurred. They found the front end of the truck down in the south ditch of the highway, the left tractor or driving wheel off the south edge of the oil mat, the opposite wheel down on the inside slope of the ditch, the left rear wheel of the trailer on the oil mat and the right rear wheel of the trailer off the oil mat. They found the coupe in the center of the road, at the rear of the truck, headed toward the southwest. They were able to trace the tracks of the truck back for a distance of fifty feet from the rear end of the truck.

The right wheel tracks were off the mat on the south shoulder of the road and the left wheel tracks on the south half of the mat. The shoulder was soft. The tracks were plain. They indicated the truck had gradually pulled over to the south edge and off the oil mat. They also found tracks of the coupe where it had skidded to the south edge of the oil mat and back toward the center and then up to the apparent point of the collision on the south half of the oil mat. They found broken glass along the north side of the truck scattered over the oil mat. They also observed some holes freshly gouged out in the oil mat about half way between the center line and the south edge of the mat and opposite the cab of the truck. The left front wheel of the truck, the left front fender and the left light were knocked back to the left tractor or driving wheel of the truck. The photograph of the coupe taken after the accident indicates nearly all of the left half of the front of the coupe collided with the truck; a portion of the front bumper was broken out approximately in the center of the bumper.

Two witnesses for Chambers testified that the larger portions of broken glass were on the north half of the mat and finer portions on the south half of the mat.

Hobart Chambers, a brother of Chester W. Chambers, testified that he went to the scene of the accident on October 4, 1934; that he observed holes in the pavement, one being about twenty-three feet and the other two about thirty feet westerly from the rear end of the truck; that they were about two to two and one-half feet in length, eight inches in width and two and one-half inches in depth; that two of them were on the north side and one on the south side of the oil mat; that he found red paint in them; that the "running gears" of the truck were painted red; and that he found broken glass near the north edge of the oil mat and in the north ditch.

In A. B. Small Company v. Lamborn & Co., 267 U.S. 248, 254, 45 S.Ct. 300, 303, 69 L.Ed. 597, the Court said:

"The rule for testing the direction of a verdict, as often has been held, is that where the evidence is undisputed, or of such conclusive character that if a verdict were returned for one party, whether plaintiff or defendant, it would have to be

sct aside in the exercise of a sound judicial discretion, a verdict may and should be directed for the other party."

See, also, Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 343, 53 S.Ct. 391, 394, 77 L.Ed. 819; F. W. Woolworth Company v. Davis (C.C.A.10) 41 F.(2d) 342, 347.

The rule is likewise settled that "when the testimony of a witness is positively contradicted by the physical facts, neither the court nor the jury can be permitted to credit it." F. W. Woolworth Co. v. Davis, supra, 41 F.(2d) 342, at page 347; American Car & Foundry Co. v. Kindermann (C.C.A.8) 216 F. 499, 502; Missouri, K. & T. Ry. Co. v. Collier (C.C.A.8) 157 F. 347, 353; Blackley v. Powell (C.C.A.4) 68 F.(2d) 457, 459; Chicago, M., St. P. & P. R. Co. v. Linehan (C.C.A.8) 66 F.(2d) 373, 380; Storey v. U. S. (C.C.A.10) 60 F.(2d) 484, 486; Larabee Flour Mills Co. v. Carignano (C.C.A.10) 49 F.(2d) 151, 153.

The tracks, scars in the pavement, broken glass and other physical facts show beyond doubt that the truck was on the south side of the road and that the coupe swerved or skidded from its side of the road and collided with the truck on the south side of the road. That a twenty-nine hundred pound automobile, travelling forty-five miles per hour, in colliding with a seventeen ton truck, would knock the truck from a position four feet north of the center line, across and off the pavement on the south side, is unreasonable. Had the collision occurred, as Chambers testified, on the north side of the oil mat, it is reasonable to assume that the light coupe would have been hurled into the ditch on the north side and not the heavy truck into the ditch on the south side. It is undisputed that the coupe remained on the oil mat after the collision.

One of the holes in the oil mat testified to by Hobart Chambers was about twenty-three feet and the other two were about thirty feet westerly from the rear end of the truck as it stood after the accident. The tires of the truck could not have made them and left the red paint therein. Hence if made by the truck they must have been made after the collision and the left front wheel was knocked off the truck. They were about fifty-five feet from the point the witnesses and the other physical facts placed the point of collision. The disinterested witnesses traced the truck tracks back a distance of fifty feet from the rear of the truck and considerably beyond where such holes were located. The right wheel tracks were off the oil mat on the south shoulder. The truck could not have made those tracks and also such holes in the pavement. There were holes on the south side of the oil mat near the cab of the truck as it stood after the accident. There were no fresh holes between the latter holes and the holes testified to by Hobart Chambers. The latter set of holes were located thusly, the farthest westerly about the center of the south half of the oil mat, the second about five feet directly north of the first, and the third about seven feet east and slightly north of the second. If the truck made both sets of holes and the accident occurred on the north half of the road the left front end of the truck would have had to jump almost at right angles a distance of about five feet, then jump about eight and one-half feet to the northeast and then float through the air without left front wheel support, a distance of about forty-three feet. Seventeen ton trucks do not perform in that manner. The photographs show many holes in the oil mat but the officers and other disinterested witnesses who viewed the scene shortly after the accident made no note of those testified to by Hobart Chambers but did note the freshly made holes on the south side of the road near the cab of the truck. We think it conclusively appeared that the holes testified to by Hobart Chambers could not have been made by the truck.

The fact that on the day following the accident Hobart Chambers found broken glass near the north edge of the oil mat and in the north ditch is not significant with respect to the location of the accident. The witnesses who viewed the scene immediately after the accident said the glass was on the oil mat north of the truck and one of Chambers' witnesses testified he gathered up the greater portion of the large pieces of glass and threw them in the ditch. The same witnesses also testified the coarse glass was on the north half of the oil mat and the fine glass on the south half. Large pieces of glass would fly farther than small ones. Therefore, the location of the broken glass is consistent with the other physical facts and indicates the accident occurred on the south half of the oil mat.

The evidence of Chester W. Chambers as to the respective courses of the coupe and truck just prior to the accident and the place of the collision stands so conclusively disputed by the physical facts that it does not constitute substantial evidence. The other evidence shows· that Chambers was guilty of negligence which was either the primary cause or a contributing cause of the accident. We conclude the Court did not err in directing a verdict for Skelly Company on the cross-petition.

■ There was evidence from which the jury would have been warranted in finding damages in favor of Skelly Company in the sum of $1,750.00. But Skelly Company's claim for damages was unliquidated. The amount of damages could not be proven with mathematical certainty. The value of the truck before and after the accident was a matter of opinion. The amount of damage was purely a question of fact for the jury. Furthermore, the issue of contributory negligence on the part of the driver of the truck was submitted to the jury without objection or exception on the part of Skelly Company. The trial court gave no explanation of its refusal to grant the motion for a new trial filed by Skelly Company.

■ A motion for a new trial ·on the ground that the damages awarded are inadequate or excessive and involving a factual inquiry, presents a matter within the discretion of the trial court and its ruling thereon ordinarily will not be disturbed on appeal. Fairmount Glass Works v. Cub Fork Coal Company, 287 U.S. 474, 481, 53 S.Ct. 252, 254, 77 L.Ed. 439; Chicago & N. W. R. Co. v. Kelly (C.C.A.8) 74 F.(2d) 31, 37; Searfoss v. Lehigh Valley R. Co. (C.C.A.2) 76 F.(2d) 762, 763; Paf Mfg. Co. v. R. L. Polk Co. (C.C.A.8) 72 F.(2d) 33; Green Const. Co. v. Chicago R. I. & P. R. Co. (C.C.A.10) 65 F.(2d) 852; Dayton Rubber Mfg.· Co. v. Sabra (C.C.A.9) 63 F.(2d) 865, 866.

In Fairmount Glass Works v. Cub Fork Coal Company, supra, the Court said:

"The rule that this Court will not review the action of a federal trial court in granting or denying a motion for a new trial for error of fact has been settled by a long and unbroken line of decisions; and has been frequently applied where the ground of the motion was that the damages awarded by the jury were excessive or were inadequate. The rule precludes likewise a review of such action by a Circuit Court of Appeals. Its early formulation by this Court was influenced by the mandate of the Judiciary Act of 1789, which provided in section 22 that there should be 'no reversal in either (circuit or Supreme) court on such writ of error * * * for any error in fact.' Sometimes the rule has been rested on that part of the Seventh Amendment which provides that 'no fact tried by a jury shall be otherwise re-examined in any court of the United States than according to the rules of common law.' More frequently the reason given for the denial of review is that the granting or refusing of a motion for a new trial is a matter within the ·discretion of the trial court. * ·* *

"Under certain circumstances the appellate court may enquire into the action of the trial court on a motion for a new trial. Thus, its denial may be reviewed if the trial court erroneously excluded from consideration matters which were appropriate to a decision on the motion. Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917; Ogden v. United States (C. C.A.) 112 F. 523; or if acted on the mistaken view that there was no jurisdiction to grant it, or that there was no authority to grant it on the ground advanced, Felton v. Spiro (C.C.A.) 78 F. 576, 581; Dwyer v. United States (C.C.A.) 170 F. 160, 165; Paine v. St. Paul Union Stockyards Co. (C.C.A.) 35 F.(2d) 624, 626–628. * * *

"To regard the verdict as inconsistent on its face is to assume that the jury found for the plaintiff and failed to perform its task of assessing damages. The trial judge was not obliged so to regard the verdict. The defendant had insisted upon several defenses and had set up a counterclaim. The plaintiffs were not entitled to a directed verdict. The evidence was voluminous; and on some issues at least, conflicting. The instructions left the contested issues of liability to the jury. The verdict may have represented a finding for the defendant on those issues; the reason for the award of nominal damages may have been that the jury wished the costs to be taxed against the defendant. * * * The record before us does not contain any explanation by the trial court of the refusal to grant a new trial, or any interpretation by it of the jury's verdict. In the absence of such expressions by the trial court in the case at bar, the refusal to grant a new trial cannot be held erroneous as a matter of law. Appellate courts

should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct. Compare Union Pacific R. Co. v. Hadley, 246 U.S. 330, 334, 38 S.Ct. 318, 62 L.Ed. 751; Dunn v. United States, 284 U.S. 390, 394, 52 S. Ct. 189, 76 L.Ed. 356 [80 A.L.R. 161]."

The record discloses no circumstances taking the instant case without the general rule and within any of the exceptions stated in Fairmount Glass Works v. Cub Fork Coal Company, supra. The situations presented in that case and in the instant case are so clearly analogous that the former rules the latter. We conclude the action of the Court in denying Skelly Company's motion for a new trial is not open to review.

The costs in 1432 will be assessed against Chambers and in 1433 against Skelly Company. The judgment is affirmed.

BRATTON, Circuit Judge (dissenting in part).

The principles which govern in making disposition of a motion for a directed verdict for insufficiency of evidence or for contributory negligence are well defined, but their application sometimes presents difficulty. In testing the sufficiency of the evidence to take a cause of action to the jury, the evidence and all inferences which may reasonably be drawn from it should be construed in the light most favorable to the party asserting the cause. All conflicts must be resolved in his favor. Waddell v. A. Guthrie & Co. (C.C.A.) 45 F. (2d) 977; Schwartzman v. Lloyd, 65 App. D.C. 216, 82 F.(2d) 822. If, when viewed in that manner, there is substantial evidence tending to support the cause of action, all countervailing evidence should be disregarded and the issue submitted to the jury. Grand Trunk Western R. Co. v. Collins (C.C.A.) 65 F.(2d) 875; Great Atlantic & Pacific Tea Co. v. Chapman (C.C.A.) 72 F.(2d) 112; Wood Lumber Co. v. Andersen (C.C.A.) 81 F.(2d) 161. A verdict should not be directed unless the evidence is uncontradicted or of such conclusive character that, should a verdict be returned for the plaintiff or cross-petitioning defendant as the case may be, the court in the exercise of sound judicial discretion would be obliged to set it aside. A. B. Small Co. v. Lamborn & Co., 267 U.S. 248, 45 S.Ct. 300, 69 L.Ed. 597; Stanolind

Oil & Gas Co. v. Kimmel (C.C.A.) 68 F. (2d) 520.

Only two witnesses to the accident testified at the trial. They were the defendant and the driver of the truck. Defendant testified that he was an experienced driver; that he had been driving automobiles since 1913; that he was thoroughly familiar with the highway on which the accident occurred and had traveled it probably 250 times; that his automobile had been in use about four months and that its steering device and brakes were in perfect condition; that he was traveling at about 45 miles per hour when he came over the brow of the hill; that he saw a cattle truck or old model automobile coming from the west and on the south side of the road; that they were about 300 feet apart at the time he first saw the approaching vehicle; that he did not see the Skelly truck at that time; that it evidently was immediately behind and following the other vehicle; that when he was within about 150 feet of the other vehicle the Skelly truck suddenly swerved to the left across the center of the highway and came to a point on the north side about three or four feet from the center; that at first he thought it would get back on its side of the road and that it started back, but failed to go back; that there were just a few seconds from the time the truck swerved across the road until the collision occurred; that he took his foot off the gas and went as far to the right as he could without going into the ditch; that he tried to get out of the way, but did not check the speed of the car. He later testified that he may have applied his brakes and he may not have done so. He was rendered unconscious and remained so for several days.

A merchant in Wichita and an employee of many years in the postal service there were the first persons to arrive at the scene. They arrived within a few minutes after the accident occurred. The first testified that the truck was standing on the south side of the road in a slanting position, with the front end headed off the shoulder toward the ditch; that the left rear corner of the truck was not so very far from the center of the road; that the Pontiac was on the north side headed west and slightly south; that it was a little west of the rear of the truck; that it was on the mat with the rear wheels one foot or a foot and a half from the edge; that there

was broken glass in the road; that the broken parts were on the north side close to the Pontiac; that there were some small, shattered parts on the south side; that to avoid cutting his tires he gathered up some of the large pieces and threw them in the ditch and kicked the rest out of the way; and that he drove past on the south side of the center. He further testified that the larger portions of the glass were on the north side, while the small, shattered parts were on the south side. The other testified that the truck was on the south side of the road; that it was probably on the mat; that the left rear wheel was on the mat and three or four feet from the edge; that the left corner of the truck extended to within five or six feet of the center of the mat; that the Pontiac was facing southwest; that its front part was four or five feet back of the oiled mat and that it was about in line with the rear end of the truck; that there was some broken glass scattered about on the mat; that most of it was on the north side; and that the majority of the fine glass was on the north side of the line. They were disinterested persons and there is nothing in the record to becloud their credibility.

A brother of defendant testified that he arrived at the place of the accident the next day; that the truck was there, but the Pontiac was not; that the front part of the truck was resting against the bank of the south ditch; that there was a marked depression in the bank; that there were three marks or gouged out places in the oil mat; that they were two to two and a half feet long, about eighteen inches wide and from two to two and a half inches deep; that they were about thirty feet west of the rear of the truck; that two of them were on the north side of the highway and one on the south side; that there was red paint in them; that the truck, including its running gears, was painted red; that he picked up a small piece of lime rock and drew a circle around each gouged out place and that a picture was then taken of the scene; that the mat was sixteen and a half feet wide; that there was a ditch about eighteen inches deep on the south side and one between three and four feet deep on the north; that he examined the shoulder west of the truck and did not see any marks, lines or tracks; that he examined the pavement east of the truck and did not find any

marks indicating skidding tires or cars; and that there was some shattered glass on the edge of the mat and in the ditch. Aside from kinship, there is nothing in the record to detract from his credibility. The picture was introduced in evidence and is before us. It shows substantial indentations in the pavement, but the red paint is not discernible.

The majority lay stress upon the respective positions of the truck and the coupe and conclude that, in view of the difference in their weight and other facts to which witnesses for Skelly testified, the collision could not have occurred on the north side of the road. Defendant testified that the truck was immediately behind a cattle truck or automobile; that, in an effort to pass it, the truck suddenly swerved to the left across the center and to the north side; and that it turned back toward the south side. The truth of that testimony should be assumed. Rationally minded persons could reasonably conclude from such facts that at the time of the collision the truck had started back to the south side and was headed in a southeasterly direction; and that it continued in that direction until it came to rest in the ditch on the south side. That is a permissible inference or deduction from the facts and circumstances disclosed in the record. The position of the truck is persuasive, but no more so than the position of the broken glass on the north side. The freshly gouged holes in the pavement opposite the cab of the truck and on the south side of the road constitute a persuasive circumstance; but a court cannot say that they overcome or wipe out the indentations behind the truck and on the north side. These circumstances are in sharp conflict, and, when taken into consideration in connection with the contradictions in the testimony of witnesses, they accentuate the conclusion that the issues should have been submitted to the jury. Furthermore, daily experience teaches that strange things frequently happen in traffic accidents. A case should not be withdrawn from the jury merely because physical circumstances are disclosed which may tend to conflict with the contentions of a plaintiff or cross-defendant, and which may seem strange to the court. It is the function of a jury to weigh and resolve such conflicts as this case presents. It was error to direct a verdict on the cross-petition.