## LEE WAY MOTOR FREIGHT, Inc. et al. v. TRUE.

### No. 3501.

Circuit Court of Appeals, Tenth Circuit.

Nov. 8, 1947.

Rehearing Denied Jan. 14, 1948.

James C. Cheek, of Oklahoma City, Okl. (George F. Short, Welcome D. Pierson, Short & Pierson, Alex Cheek, John· D. Cheek, and Cheek, Cheek & Cheek, all of Oklahoma City, Okl., on the brief), for appellants.

Duke Duvall, of Oklahoma City, Okl. (Dudley, Duvall & Dudley, of Oklahoma City, Okl., on the brief), for appellee.

Before PHILLIPS, HUXMAN and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

This is an action brought by True against Lee Way Motor Freight, Inc.,[1] and a cross action brought by Lee Way and Employers Casualty Company against True, each seeking property damage, growing out of a collision between two trucks owned and operated by True and Lee Way. True and Lee Way are common carriers of freight. The True truck consisted of a tractor and a semi-trailer tank of 4,605 gallons capacity. The Lee Way truck consisted of a tractor and a trailer. The collision occurred on Highway 66, an east and west highway, at a point about one-half mile east of Luther, Oklahoma, at about 4:30 a. m., August 21, 1945. The True vehicle was traveling west, en route from Tulsa to Oklahoma City with a cargo of gasoline. The Lee Way vehicle was traveling east en route from Oklahoma City with a cargo of freight. The collision occurred on a bridge. In both directions from the bridge the highway runs on an upgrade.

Praytor, the driver of the True truck, testified that he had changed a leaky tire at Stroud, Oklahoma; that as he approached the bridge he stopped to urinate and examine his tires; that he then proceeded on; that as he pulled his truck back into the highway and was straightening out he saw the Lee Way truck coming over the hill from the opposite direction; that both he and the Lee Way driver dimmed their lights; that "I thought I would have time to get across the bridge before he [Lee Way] got on it, and that is the last thing I remember." He further testified that the grade from the east was not quite as steep as the grade from the west; that, in his judgment, at the time of the collision he was traveling 25 to 30 miles an hour and the Lee Way vehicle was traveling 45 to 50 miles an hour; that he did not cross the center line of the highway at any time

from the top of the hill to the point of collision.

Over an objection, he was permitted to testify that he was taken to a hospital and was unconscious for 36 hours; that his skull was fractured and that he suffered from dizzy spells and at times his mind went "blank."

Mitchell, the driver of the Lee Way truck, testified that he was traveling 30 to 32 miles an hour; that as the True truck approached he dimmed his lights; that he signaled with his lights two or three times but that the driver of the True truck did not dim his lights; that the True truck made a swerve over the center line of the road and then pulled back to the right side of the road; that when the True truck was about 100 feet from the Lee Way truck the former angled toward him and came over the center line of the road; that the True truck was over the center line about a foot or a foot and a half at the time of the collision and that the Lee Way truck was at all times on its side of the road and at no time crossed the center line; and that in his effort to avoid the collision he pulled over as close to the south bannister of the bridge as was possible without impinging on the bannister.

Over objection, the following questions were asked and answers adduced on cross-examination:

"Q. You are an official of the Teamsters' Union aren't you?—A. At the present, yes sir.

"Q. I will ask you to state whether or not it isn't true that you are involved in the 'Quick Charge' case that the law firm of which I am a member is contesting the union in on the 6th floor of this building now, and has been for nearly a week.—A. I would be glad to answer it. I was hired by this Teamster's Local and I have been a member of that Local for some years, and upon the 27th day of last February it become necessary that the Lee Way Motor Freight Company I was employed by—

"Q. The only question I asked you— A. I want to tell you my relation with the—

---

[1] Hereinafter called Lee Way.

"Q. All I asked you was if you are an official of the Union?—A. As an employee.

"Q. You are employed by the Union?—A. That is right.

"Q. And you have been in the court room during the trial of that case in which Judge Dudley, the head of my firm is engaged, ever since it has been on trial?—A. The Local Union has.

"Q. You have been present too haven't you?—A. As a witness.

"Q. I will ask you to tell this jury if it isn't true that you have a bitter feeling against me and my firm on account of the fight going on down there, and also because Mr. True and his line was not a closed shop line?—A. No, sir, I certainly do not."

Clarence Hall testified that he made an examination at the scene of the collision on the afternoon of August 22, 1945; that he observed sand on both the north and south sides of the bridge; that the sand extended out 14 to 18 inches from the south side of the bridge and about 6 to 8 inches from the north side of the bridge; that he observed no motor vehicle tracks in the sand; that he observed a skid mark on the south side of the bridge about 18 inches from the bridge bannister; that it was about 28 inches from the bannister where it left the bridge; that he observed skid marks on the north side of the bridge about 18 inches from the north bannister and that they ran parallel with the bannister. There was no evidence of the width of the bridge or of the True tractor or trailer.

Highway 66 is a heavy-traveled thoroughfare between Oklahoma City and Tulsa.

William R. Park, a member of the State Highway Patrol, reached the scene of the accident about 50 minutes after it occurred. He testified that there had been no change in conditions between the time of the accident and his arrival and that he observed the following conditions: The Lee Way truck was 137 feet from the east end of the bridge in a barrow pit on the north side of the road, headed in an easterly direction; the tractor of the True truck was 236 feet and its trailer 432 feet from the west end of the bridge in the barrow pit on the south side of the road. The length of

the bridge was about 85 feet. The point of impact was about 15 feet from the east end of the bridge. On the south side of the bridge, there were skid marks made by the Lee Way truck and rubber marks on the curb at the foot of the south bannister. The skid marks led from the point of impact south and east, showing the skid was in a southeasterly direction. The skid marks were 18 inches south of the center line of the bridge.

Robert Lamb, a member of the State Highway Patrol, arrived at the scene of the accident about 8 a. m., August 21, 1945. He and Park rechecked the distances with a steel tape and reexamined the conditions at the scene of the accident. Lamb observed the skid marks about 18 inches south of the center line, determined the point of impact, and observed tire marks leading in both directions from the point of impact to the respective vehicles. The south tire marks of the True truck and the tire marks of the Lee Way truck, at the point of impact, were south of the center line of the bridge.

Albert Fesler, a farmer, arrived at the scene of the accident a short time after it occurred. He observed the skid marks at the south side of the center line leading easterly and traced them and one tire mark leading therefrom to the Lee Way truck. He, also, observed the mark on the south curb.

Landrum L. Gleason, a farmer, arrived at the scene of the collision shortly after Fesler. Gleason testified the dust was still in the air. He observed the skid marks south of the center line.

In his charge, the court did not limit the consideration which the jury might give to the testimony of Mitchell quoted above.

From a judgment on a verdict returned in favor of True, Lee Way has appealed.

■ We regard the testimony of Hall as having no probative value. There was no proof that the tracks which he observed on the bridge more than 30 hours after the collision were made by either of the vehicles involved in the collision. Indeed, it it reasonably certain that the heavy travel on Highway 66 would have obliterated the tracks of the True and Lee Way vehicles

long before Hall reached the scene of the collision.

■ The physical facts as testified to by disinterested and unimpeached witnesses squarely contradict the testimony of Praytor and support the testimony of Mitchell. The general rule is well settled that "when the testimony of a witness is positively contradicted by the physical facts, neither the court nor the jury can be permitted to credit it."[2]

The verdict was so at variance with the conclusion compelled by the physical facts, which were established by unimpeached and uncontradicted evidence, we are constrained to the conclusion that it resulted from improper and prejudicial evidence relating to extraneous matters.

■ The evidence as to the serious extent of Praytor's injuries was not material to any issue in the case and was calculated to incite sympathy and prejudice in the minds of the jurors. It was purportedly offered to explain the failure of Praytor to testify to the events which occurred immediately after the collision. That purpose could have been amply served by showing he was rendered unconscious at the time of the impact and remained so for some time thereafter.

■ Likewise, we think the facts elicited from Mitchell on cross-examination were immaterial to any issue and that they probably placed Mitchell in an unfavorable light before the jury. We are not unmindful that a witness may be examined with respect to his membership in an organization of which one of the parties to the action is a member, on the theory that the witness might be biased in favor of his fellow member.[3] Also, it has been held proper to inquire of a witness, called by one party, whether such witness and the opposite party are not adherents of opposite political factions in a community.[4] But here, Lee Way was a corporate entity,

an employer, not an employee, and, of course, was not a member of any union, and there was no occasion for inquiry as to Mitchell's union affiliations and activities. With respect to possible animosity on the part of Mitchell toward True's counsel, it would have been sufficient to have inquired whether or not Mitchell was not interested in pending litigation in which True's counsel represented one of the parties, and whether, on account of such litigation, Mitchell did not have a bitter feeling against counsel for True. It was wholly unnecessary in that connection to go into Mitchell's union affiliations. We know that at the time of the trial of the instant case, November 20, 1946, there was much controversy with respect to actions of unions and union leaders, and that the actions of the union involved in the "Quick Charge" case were of a controversial character and calculated to incite prejudice in the minds of certain persons against that union.

For the reasons indicated, the judgment is reversed and the cause remanded with instructions to grant appellants a new trial.

MURRAH, Circuit Judge (dissenting).

I would affirm the judgment. The case was submitted to the jury on the clear-cut issue of negligence, without objections. After instructions, to which there were no objections or exceptions, the jury returned a verdict for the appellee, and the only questions presented on appeal are: (1) whether the evidence was sufficient to support the verdict, and (2) whether the court erred in allowing counsel to cross-examine one of the witnesses concerning his enmity toward a member of his firm, for the purpose of impeaching the credibility of his testimony.

The great weight of the evidence on the issue of negligence is in favor of the appellant. It is difficult for me to justify the verdict of the jury, but the evidence was

---

2 Chambers v. Skelly Oil Co., 10 Cir., 87 F.2d 853, 856; F. W. Woolworth Co. v. Davis, 10 Cir., 41 F.2d 342, 347; Elzig v. Gudwangen, 8 Cir., 91 F.2d 434, 440; Wise v. Wise, 175 Okl. 310, 52 P.2d 715, 717.

3 See Huss v. Heydt Bakery Co., 210 Mo. 44, 108 S.W. 63, 67, 68; State v.

Blackwood, 103 Wash. 529, 175 P. 168, 169; Felice v. State, 18 Okl.Cr. 313, 194 P. 251, 252; People v. Cowan, 1 Cal.App. 411, 82 P. 339, 341; Note, 74 A.L.R. 1157.

4 State v. Malmberg, 14 N.D. 523, 105 N.W. 614, 615.

not all one way. Appellee's driver testified positively that he approached the point of collision with caution, and at no time crossed the center line of the highway. Manifestly, one of the trucks did cross the center line, causing the accident. It may be that this testimony was negative in form, but its strength or weakness depends upon the circumstances, and its weight in general was for the jury. Wigmore on Evidence, 3d Ed. 664. See also Sand Springs Ry. Co. v. McWilliams, 170 Okl. 85, 38 P.2d 539, Annot. 140 A.L.R. 530. The trial court, who heard the evidence, accepted the verdict, and it is not our province to set it aside unless we can say it is wholly without support in the record, or that the evidence relied upon to support the verdict is for some reason incompetent.

The majority quotes from the cross-examination of appellant's driver, the admitted purpose of which was to test the credibility of his testimony. As I understand the majority opinion, it was concededly permissible to inquire concerning Mitchell's animosity for appellee's counsel, or a member of his firm, and further, whether Mitchell's interest in litigation, in which appellee's counsel or member of his firm represented one of the opposing parties, did not embitter him against counsel in this case. But the majority holds it improper to inquire concerning his union affiliations, to show his interest in the litigation, which might cause his enmity.

The record does not indicate that the parties attached as much significance to this bit of testimony during the trial as they do now on appeal. It is rare indeed to reverse a case because the trial court abused its discretion in permitting counsel to cross-examine a witness on matters which affected his mental attitude, or caused any bias or prejudice. I am unable to say that the mention of the witness' union affiliations so completely subverted the minds of the jurors that they were prevented from giving proper consideration to the facts. We are not the triers of the case. It is for us to determine only, in the last analysis, whether in circumstances like these, justice was perverted. I cannot so say in the light of all the facts.